UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
MARYAM AYAZI,

                      Plaintiff,

    - against -

UNITED FEDERATION OF TEACHERS,
LOCAL 2,

                  Defendant.
-----------------------------------------------------X

**MEMORANDUM &
ORDER**

99 CV 8222 (CLP)

       On December 21, 1999, plaintiff Maryam Ayazi, proceeding pro se, commenced this action against the United Federation of Teachers, Local 2 ("UFT" or the "Union"), alleging that the UFT discriminated against her because of her disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"). Presently before this Court is defendant's renewed motion for summary judgment and plaintiff's cross-motions seeking to: 1) strike defendant's renewed motion for summary judgment, 2) compel defendant to provide specific answers to plaintiff's first set of requests for admissions, and 3) provide such other relief as is appropriate.

       For the reasons set forth below, the defendant's motion for summary judgment is granted, and plaintiff's cross-motions are denied.

1

Plaintiff Maryam Ayazi, who suffers from post-polio syndrome (Def.'s 56.1 Stmnt [2] ¶ 2), an impairment within the definition of the ADA, is a teacher who primarily taught English as a Second Language ("ESL"). (Pl.'s 56.1 Stmnt[3] ¶¶ 2). In January 1996, Ms. Ayazi received a Certified Provisional Teaching Certificate ("CPT") to teach ESL in the New York City Secondary Schools.[4] (Pl.'s 56.1 Stmnt ¶¶ 5-6). Thereafter, plaintiff was hired as a probationary teacher in the New York City schools from May 3, 1996 until her probationary teacher status was terminated one year later on June 26, 2001 after she received several unsatisfactory ratings. (Pl.'s 56.1 Stmnt ¶¶ 2, 10; Def.'s 56.1 Stmnt ¶ 1; Ayazi Aff.[5] ¶ 5).

Plaintiff was initially hired on May 3, 1996 to teach in the Office of Adult and Continuing Education as an ESL classroom teacher. (Pl.'s 56.1 Stmnt ¶ 7). On May 24, 1996, she passed the Board of Education's (the "Board" or "BOE") oral examination and was issued a Conditional New York City ESL license. (Id. ¶ 8). She began teaching on September 3, 1996 at the Franklin K. Lane High School, but experienced difficulty getting to classes due to her disability. (Id. ¶¶

---

[1] The factual background of this case was previously set forth in this Court's earlier Report and Recommendation (the "2002 Report"), dated December 24, 2002; the facts most pertinent to the motion are repeated herein.

[2] Citations to "Def.'s 56.1 Stmnt" refer to Defendant's 56.1 Statement filed on June 24, 2008.

[3] Citations to "Pl.'s 56.1 Stmnt" refer to Plaintiff's 56.1 Statement filed on August 7, 2008.

[4] Plaintiff also received CPTs to teach ESL to Adults and to teach Art in the Day High Schools. (Pl.'s 56.1 Stmnt ¶ 9).

[5] Citations to "Ayazi Aff." refer to Ms. Ayazi's Affidavit in Opposition to Defendant UFT's Local Rule 56.1(a) Statement of Material Facts, dated May 29, 2002.

10, 12).  When plaintiff's supervisor arranged to allow plaintiff to teach in one classroom, other teachers complained and plaintiff was advised to request an accommodation.  (Id.)

On October 16, 1996, plaintiff filed a written request for a medical accommodation with the Board's medical department.[6]  (Id. ¶ 13).  Plaintiff claims that upon entering service, a teacher must submit to a physical examination, the results of which are reflected on a database known as "Inquire on Medical Results."  (Id. ¶ 15).  Plaintiff alleges that her request for an accommodation was reflected on the "Inquire" screen with the notations "AC" and "R," meaning "medical [accommodation] under review."  (Id. ¶ 16).  Plaintiff further claims that the medical department has direct access to the Board's database that processes requests for medical accommodations and that results entered onto the "Inquire on Medical Results" screen interface with the Board's licensing screens.  (Id. ¶¶ 14, 16, 17).  Plaintiff alleges that the Chancellor of the Board requires teachers to maintain an "S" rating and that the "R" notation interfered with her City License 559B/TT.  (Id. ¶¶ 20, 22).  She further claims that her teaching license was later terminated as a result of this "R" rating without her knowledge.  (Id. ¶ 20).[7]

On February 3, 1997, plaintiff was transferred[8] to Grover Cleveland High School where

---

[6]Plaintiff stated that due to her poliomyelitis, she needed "a single classroom or classrooms that are on the same floor and near each other," and that she should "not be given extra school assignments that involve heavy physical work or involve a lot of walking or running from one place to another such as a hall monitor assignment." (Pl.'s 56.1 Stmnt, Ex. 3).

[7]Plaintiff candidly notes in her Statement of Disputed Facts that the Board's medical supervisor, Mercuria Gibson, denied that the medical screen could affect the validity of a license. (Id. ¶ 21; see also Affidavit of Mercuria Gibson, dated November 23, 2004, attached as Exhibit 31 to Plaintiff's Statement of Disputed Facts).

[8]According to a January 23, 1997 letter from Herb Heumann, Assistant Principal at Franklin K. Lane High School, Ms. Ayazi was "excessed" due to "reorganizational needs;" the transfer was not a reflection on her performance. (Pl.'s 56.1 Stmnt, Ex. 3).

she was assigned to teach in two classrooms on the second floor. (Pl.'s 56.1 Stmnt ¶ 30). Despite her disability, which makes it difficult for plaintiff to climb stairs, plaintiff claims that she was required to go to the ESL office on the third floor between periods to prepare for class and to rest even though the Foreign Language Department had an office on the second floor of the school that she could have used.[9] (Pl.'s 56.1 Stmnt ¶¶ 33-35; see also Transcript of Chancellor's Hearing, id., Ex. 15). Plaintiff further claims that the elevator in the building was malfunctioning most of the time, making it difficult for her to reach her classrooms and the office on the third floor. (Pl.'s 56.1 Stmnt ¶ 36).

Plaintiff alleges that on or about March 14, 1997, she complained to Al Samuels, her UFT representative, that she was being subjected to harassment and disparate treatment by her immediate supervisor, Aldo Guarnieri, and she requested an accommodation and transfer. (Pl.'s 56.1 Stmnt ¶ 37; Am. Compl.[10] ¶¶ 42-43).[11] She further alleges that although Mr. Samuels agreed to mediate between plaintiff and her supervisor, Samuels did nothing when the supervisor refused to meet with him and he failed to pursue plaintiff's complaints. (Am. Compl. ¶ 45). Plaintiff further alleges that Samuels never complained on plaintiff's behalf even though he was aware that the elevator in the school, which Ms. Ayazi needed to use to get to her classroom on time, was constantly breaking down and in need of repair. (Id. ¶ 46).

---

[9]At the Chancellor's Hearing held on September 28, 1999, Mr. Myron Liebrader, Principal of Grover Cleveland High School, testified that Ms. Ayazi was not barred from using the Foreign Language Office. (Pl.'s 56.1 Stmnt, Ex. 15).

[10]Citations to "Am. Compl." refer to plaintiff's Amended Complaint filed on May 30, 2001.

[11]She requested a transfer as allowed for people who have to travel over one hour and 40 minutes to get to their job. (Pl.'s 56.1 Stmnt ¶ 37).

On June 20, 1997, plaintiff was informed that she was being terminated from Grover Cleveland High School effective June 26, 1997, after she received three unsatisfactory classroom evaluation reports between March and May of 1997, and was given a "U-rating." (Def.'s 56.1 Stmnt ¶¶ 3, 4, 8; Pl.'s 56.1 Stmnt ¶ 48). The U-rating stood for "unsatisfactory" with regards to her teaching service. (Id.) The UFT challenged these unsatisfactory reports through Step II of the labor agreement's grievance arbitration procedure. (Def.'s 56.1 Stmnt ¶¶ 3, 4). However, the UFT advised plaintiff by letter on November 10, 1997, that it would not proceed to Step III of the procedure because, in the UFT's opinion, the grievances lacked merit. (Def.'s 56.1 Stmnt ¶ 4).

On December 18, 1997, plaintiff attended a hearing with Michael Gottlieb, a representative from the UFT, to challenge the termination of her probationary appointment and her U-rating. (Def.'s 56.1 Stmnt ¶ 10; Pl.'s 56.1 Stmnt, Ex. 13). Thereafter, on January 4, 1998, plaintiff sent a letter to UFT representative George Fesko describing her reaction to the hearing and asking for a lawyer. (Def.'s 56.1 Stmnt, Ex. 5 at 1). In that letter, plaintiff noted that the "hearing went reasonably well." (Id.) She also noted in her letter that the Union representative refused to tell the panel of the Board's failure to grant her an appropriate accommodation.[12] (Id.) However, plaintiff was permitted to present documents to the panel to support her claim of disability, which documents were accepted by the panel. (Id.; Pl.'s 56.1 Stmnt, Ex. 13).

_____

[12]According to a later request for accommodation submitted on June 3, 1998, plaintiff sought five discrete accommodations: a "non-travelling program," limited stair climbing, elevator accessability, worksite accessible by public transportation, and "permission to alternate between sitting and standing during my work assignments in the classroom." (Pl.'s 56.1 Stmnt, Ex. 40). In this request, plaintiff notes that she made substantially similar requests on January 27, 1997, December 22, 1997, and March 11, 1998.

On February 2, 1998, plaintiff wrote to George Fesko complaining about her inability to find a full-time job. (Def.'s 56.1 Stmnt ¶ 18). On May 26, 1998, UFT representative, Peter Mayglothling, sent a letter to plaintiff detailing his investigation into plaintiff's allegations concerning the Board's refusal to employ her in a full-time position and explaining that he believed that her allegations had no factual basis. (Def.'s 56.1 Stmnt ¶ 19). Thereafter, on May 31, 1998, the UFT sent plaintiff a copy of the Board's decision sustaining the termination of her probationary service. (Def.'s 56.1 Stmnt ¶ 14).

On June 8, 1998, plaintiff filed an improper practice charge against the UFT with the New York State Public Employment Relations Board ("PERB"), which she amended on July 1, 1998, and again on August 3, 1998. (Pl.'s 56.1 Stmnt ¶ 94; see Def.'s 56.1 Stmnt, Ex. 3[13]). The charge claimed that the UFT had failed to file a claim on plaintiff's behalf pertaining to the BOE's failure to accommodate her disability. (Def.'s 56.1 Stmnt, Ex. 3). The charge was subsequently dismissed in its entirety by an Administrative Law Judge on May 10, 1999, and the decision was affirmed by the PERB on November 18, 1999.[14] (Def.'s 56.1 Stmnt, Exs. 3-4).

On September 14, 1998, the BOE sent plaintiff a letter stating that her request for an accommodation would be reviewed if she was able to find employment with a district in her license area. (Def.'s 56.1 Stmnt ¶ 16). By letter dated September 28, 1998, the BOE denied

---

[13]Exhibit 3 to Defendant's 56.1 Statement is the opinion issued by the PERB dismissing plaintiff's charge in its entirety.

[14]Defendant acknowledges that the PERB decision dismissing plaintiff's charge against the UFT does not have any res judicata or collateral estoppel effect on plaintiff's claims in this federal suit. See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 470 n.7 (1982) (stating that "it is clear that unreviewed administrative determinations by state agencies. . . . should not preclude [federal court] review even if such a decision were to be afforded preclusive effect in a State's own courts"); see also Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001).

plaintiff's application for a Fine Arts License in view of her "record of full-time service based upon poor classroom management and ineffective instruction." (Def.'s 56.1 Stmnt ¶ 25).

On July 16, 2008, plaintiff filed a discrimination claim against the UFT, which was submitted to the Equal Employment Opportunity Commission ("EEOC"). (Def.'s 56.1 Stmnt ¶¶ 28-30). In her EEOC complaint, plaintiff claimed that: 1) the UFT failed to represent her in her claim of disability discrimination in employment; 2) failed to adequately represent her at the December 18, 1997 hearing; 3) refused to provide her legal representation to overturn her discontinuance; 4) rejected a salary grievance she sought to file; and 5) refused to help her obtain a medical accommodation from the Board. (Def.'s 56.1 Stmnt ¶ 31). Plaintiff also claimed that the UFT retaliated against her after she filed her charge against the UFT with the PERB on June 8, 1998. (Def.'s 56.1 Stmnt ¶ 32). On September 15, 1999, the EEOC issued a "Dismissal and Notice of Rights" to plaintiff. (Def.'s 56.1 Stmnt ¶ 34).[15]

Plaintiff commenced this action against the UFT on December 21, 1999. In her Amended

_____

[15]On June 27, 1997, and June 18, 1998, plaintiff brought charges with the EEOC naming the BOE as respondent and alleging that the BOE had violated the ADA by failing to provide plaintiff with a reasonable accommodation, retaliated against her by placing an "R" notation on her license, and treated her differently because of her disability. On September 3, 1998, the EEOC issued a right to sue letter with respect to Ms. Ayazi's claims against the Board. In addition to filing a charge with the EEOC, plaintiff also filed an Article 78 proceeding against the Board to challenge the Board's discontinuance of her probationary service. On June 18, 1999, Justice Randolph Jackson of Supreme Court, Kings County, annulled the discontinuance and remanded the matter for review. A second review was conducted on September 28, 1999 and the discontinuance was upheld. Thereafter, plaintiff filed a second Article 78 challenge. On October 20, 2000, Justice Jackson dismissed plaintiff's petition. (Def.'s 56.1 Stmnt ¶¶ 35-38). Plaintiff also filed two separate federal actions against the BOE, on December 1, 1998 (Docket No. 98-CV-7481) and then on June 12, 2008 (Docket No. 08-CV-2456). Following a motion for summary judgment, the cases against the Board are now pending before the Honorable Nicholas G. Garaufis.

Complaint, plaintiff alleges five different causes of action: 1) the UFT discriminated against her in violation of the ADA by declining to represent her in her requests for an accommodation for her disability; 2) the UFT retaliated against her for raising her concerns about the UFT's obligation to represent her in getting a reasonable accommodation from the BOE; 3) the UFT refused to raise the issue of disability while representing her during the termination of her probationary service process; 4) the UFT has harmed plaintiff's ability to obtain gainful full-time employment through the arbitrary and discriminatory lack of representation regarding the improper cancellation and restriction of her teaching licenses; and 5) the UFT subjected her to a different standard of review for her grievances than was applied to other members of the UFT, based on her disability. (Am. Compl. ¶¶ 104-13).

## PROCEDURAL BACKGROUND

On July 9, 2002, following discovery, defendant UFT filed an initial motion for summary judgment and on December 24, 2002, this Court issued a Report and Recommendation, recommending that defendant's initial motion for summary judgment be granted but allowing plaintiff additional time to submit a Rule 56(f) affidavit to obtain additional discovery in order to sustain her claims.

On December 19, 2003, the Honorable Nicholas G. Garaufis adopted the 2002 Report in its entirety,[16] with the exception of a ruling that some of plaintiff's claims were not timely filed

---

[16] On April 30, 2008, the parties consented to have the case referred to the undersigned for all purposes.

with the EEOC.[17] In affirming the findings of the 2002 Report, the district court found, based on the evidence presented at that time, that: "1) Ayazi has adduced no facts to show that UFT violated its duty of fair representation by treating her differently from a similarly situated member who was not disabled; 2) Ayazi is barred by collateral estoppel from contesting the factual findings[18] made by the state court in her Article 78 proceeding against the Board;[19] and 3) Ayazi never raised the issue of a "medical bar" being placed on her teaching license in her EEOC charge, so she cannot raise it in this lawsuit." Id. at 2 (numbering added). The district court, however, also adopted this Court's recommendation that Ms. Ayazi be given an opportunity to submit a Rule 56(f) statement, and supplement the record within the Rule 56(f) process. Ayazi v. United Federation of Teachers, No. 99-8222, (E.D.N.Y. Mar. 12, 2004) (Corrected Order[20] of District Court, Docket No. 62).

---

[17]The 2002 Report recommended that plaintiff's claims relating to Mr. Samuels and the Union's failure to pursue her grievances be dismissed as untimely based on information in the record indicating that her EEOC Complaint was filed beyond the 300 day limit. Following the issuance of the Report, plaintiff submitted additional information demonstrating that her EEOC filing was in fact timely. The district court accordingly set aside that section of the 2002 Report.

[18]The state court found that, contrary to plaintiff's charge against the Board, "there is simply no evidence of the failure of respondents to accommodate for petitioner's disability." (Def.'s 56.1 Stmnt, Ex. 12).

[19]Although res judicata, or claim preclusion, "does not bar subsequent litigation when the court in the prior action could not have awarded the relief requested in the new action," Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287 (2d Cir. 2002), the doctrine of collateral estoppel, or issue preclusion, is unaffected in such circumstances. T.S. Haulers, Inc. v. Cardinale, No. 09 CV 451, 2010 WL 4275310 at *5 (E.D.N.Y. Feb. 16, 2010) (citing Genova v. Town of Southampton, 776 F.2d 1560, 1561 (2d Cir. 1985)).

[20]The district court issued its first opinion regarding the 2002 Report and Recommendation on December 24, 2003. Thereafter, on March 12, 2004, the court issued an opinion correcting the spelling of plaintiff's name from "Arazi" to "Ayazi." However, apart from the spelling of plaintiff's name, the two opinions are otherwise identical in content.

On August 28, 2007, pursuant to plaintiff's request for certain additional discovery, this Court issued an order requiring defendant to: 1) provide copies of any logs of conversations and meetings between plaintiff and Alvin Samuels (a former PM[21] Staffer at UFT's Queens Borough Office and UFT Chapter Chairperson at Grover Cleveland High School), or provide an affidavit regarding the efforts used to locate the log(s); and 2) provide a Rule 30(b)(6) witness to address certain issues raised by plaintiff relating to the policies and procedures of the UFT with respect to the type of grievance that plaintiff was facing, the alleged medical bar, and the UFT's knowledge of the Board's licensing policies and salary grievance procedures. (Order dated August 28, 2007; Transcript of Proceedings filed on June 20, 2008; Def.'s 56.1 Stmnt ¶ 45).

In response, defendant submitted two affidavits from Alvin Samuels, one dated September 26, 2007, and one dated December 12, 2007. (Def.'s 56.1 Stmnt ¶ 46). These affidavits state that Mr. Samuels had no logs or notes of any conversations or meetings with plaintiff, either in his capacity as PM Staffer or UFT Chapter Chairperson. (Def.'s 56.1 Stmnt, Exs. 17, 18).

In addition, since the time of the 2002 Report, plaintiff has conducted the depositions of George Fesko, former Assistant to the UFT President, and Howard Solomon, Current Director of the UFT Grievance Department. (Def.'s 56.1 Stmnt ¶ 48). Following those depositions, plaintiff served a request for admissions to which defendant responded on January 18, 2008.

On April 30, 2008, the parties consented to the jurisdiction of the undersigned for all

---

[21]PM stands for Physical and Medical. (Pl.'s 56.1 Stmnt ¶ 15; Def.'s 56.1 Stmnt, Ex. 16).

purposes, and on June 24, 2008, defendant UFT filed a renewed motion for summary judgment.[22] On August 7, 2008, plaintiff filed a cross-motion to: 1) strike defendant's renewed motion for summary judgment; 2) compel defendant to provide specific answers to plaintiff's first set of requests for admissions; and 3) obtain any other appropriate relief.

Before these motions could be decided, the case was stayed on March 12, 2009, to allow plaintiff's bankruptcy trustee to decide whether he wanted to pursue this litigation or abandon the claims.[23] On December 15, 2009, plaintiff informed this Court by letter that the bankruptcy trustee had reviewed the claims and decided to abandon them. On March 18, 2010, the Court heard oral argument on the parties' respective motions.

Therefore, the question presented by defendant's motion is whether the new evidence submitted by plaintiff, consisting of the depositions of Mr. Fesko and Mr. Solomon, the UFT's response to the request for admissions, and the affidavits of Mr. Samuels, considered together with the evidence previously offered, now constitutes sufficient evidence to show that there are material issues of fact remaining in this case that require a trial.

---

[22]However, this motion was not fully briefed by the parties until January 30, 2009 after the Court granted plaintiff the opportunity to submit additional evidence.

[23]On October 3, 2002, plaintiff filed for Chapter 7 Bankruptcy protection. When it was subsequently determined that plaintiff had failed to list related litigation against the BOE, the district court found that the lawsuit was by law part of the property of the bankruptcy estate, and therefore that plaintiff lacked standing. See Ayazi v. New York City Board of Education, No. 98-7461, Memorandum & Order dated July 14, 2006. After the Second Circuit vacated the district court's ruling, the matter was stayed to allow the Trustee in Bankruptcy to consider plaintiff's claims in the litigation against the BOE and in this related suit. Ayazi v. New York City Board of Education, No. 98 CV 7461, Order dated March 11, 2009.

DISCUSSION

A. Motion for Summary Judgment

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. College at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985), the court should not grant summary judgment unless it is clear that all of the elements have been satisfied. See Auletta v. Tully, 576 F. Supp. 191, 194 (N.D.N.Y. 1983), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). "A defendant may move for

12

summary judgment on the ground that the plaintiff has failed to adduce any evidence of an element of plaintiff's claim, and if the plaintiff fails in response to contest this assertion or adduce such evidence, defendant, without more, will prevail." Giannullo v. City of New York, 322 F.3d 139, 141 n.2 (2d Cir. 2003).

In reversing a grant of summary judgment, the Second Circuit noted that the "[t]rial court's task at the summary judgment motion state of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995) (quoting Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)).

Here, plaintiff's claims allege that the UFT violated its duty of fair representation and discriminated against plaintiff because of her disability. In the context of a claim based on an alleged breach of the duty of fair representation, courts in this circuit have required plaintiffs to "set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty, or arbitrary exercise of discretion." Gold v. Local Union No. 888, United Food & Commercial Workers Int'l Union, 758 F. Supp. 205, 208 (S.D.N.Y. 1991) (internal quotations omitted); see also Ross v. Comm. Workers of America, Local 110, No. 91 CIV 6397, 1995 WL 351462, *5 (S.D.N.Y. June 1995) (same), aff'd, 100 F.3d 944 (2d Cir. 1996). Similarly, while "an extra measure of caution is merited" when considering summary judgment on a discrimination action because "direct evidence of discriminatory intent is rare and such intent must often be inferred . . . summary judgment remains available for the dismissal of discrimination cases lacking genuine issues of material fact." McIntyre v. Longwood Central School District, 658 F. Supp. 2d 400, 411 (E.D.N.Y. 2009); cf., Holcomb v. Iona Coll., 521 F.3d

130, 138 (2d Cir. 2008) (holding that there is a "need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent") (citing cases).

When the party opposing summary judgment is pro se, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation and citation omitted). "[H]owever, a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Thompson v. Tracy, No. 00 CV 8360, 2008 WL 190449, at *5 (S.D.N.Y. Jan. 17, 2008) (internal quotation omitted).

Since a pro se litigant may not clearly understand the significance of a motion for summary judgment and may not be aware that she must file her own affidavits in order to preserve factual issues in controversy, both federal case law and Local Civil Rule 56.2 of the Eastern and Southern Districts of New York require that special care be taken to ensure that pro se litigants are made aware of such important procedural issues. See Vital v. Interfaith Med. Ctr., 168 F.3d 615, 621 (2d Cir. 1999) (citing M.B. #11072-054 v. Reish, 119 F.3d 230, 232 (2d Cir. 1997) (per curiam)); see also McPherson v. Coombe, 174 F.3d at 281.

Here, plaintiff received the requisite Notice to Pro Se Litigant Opposing Motion for Summary Judgment, required to be served pursuant to Civil Rule 56.2, and plaintiff has filed an affidavit in response to the defendant's Rule 56.1 Statement. "The nature of the papers submitted by the [pro se] litigant and the assertions made therein as well as the litigant's participation in proceedings before the District Court" permit this Court to determine that Ms. Ayazi had a sufficient understanding of the nature and consequences of summary judgment so

14

that the motions may be considered. Vital v. Interfaith Med. Ctr., 168 F.3d at 621 (internal quotations omitted).

## B.  Plaintiff's Claims

As noted in the 2002 Report, dated December 22, 2002, plaintiff's Amended Complaint included claims that the UFT violated its duty of fair representation and discriminated against her by:  1) failing to properly represent her in challenging the Board's decision to terminate her probationary status; 2) failing to pursue her claims for a reasonable accommodation; and 3) failing to represent her in challenging the illegal termination of her teaching licenses based on a "medical bar" which plaintiff claims was instituted because of her request for an accommodation. Plaintiff alleges that the Union discriminated against her and treated her differently from similarly situated individuals because of her disability and that the Union's failure to properly represent her was motivated by the Union's animus toward her based on her disability.

In her papers filed in response to defendant's most recent motion for summary judgment, plaintiff contends that her claim of discrimination does not, as the UFT argues, derive from the discontinuance of her probationary teaching license, but rather from the termination of her regular license after she requested a reasonable accommodation. (Pl.'s Mem.[24] at 3).   While this seems to suggest that her claim is now focused on the Union's failure to challenge the "R" rating placed on her license when she requested a reasonable accommodation, at the same time, she raises a number of additional arguments in her papers that suggest that she is still pursuing claims

---

[24]Citations to "Pl.'s Mem." refer to Plaintiff's Memorandum of Law in Opposition to the defendant's motion for summary judgment, filed on August 7, 2008.

based on the Union's actions in connection with the termination of her probationary status. Specifically, plaintiff argues in her papers that the UFT: 1) failed to properly represent her in challenging the classroom observation reports; 2) refused to raise issues of disability discrimination in the context of her termination proceedings; and 3) retaliated against her by not pursuing her reinstatement after the Chancellor changed the reason for her termination.

Accordingly, the Court addresses each of the claims as initially raised in her Amended Complaint.

## C. The Union's Alleged Failure to Support Their Case with Facts

As an initial matter, plaintiff contends that summary judgment should be denied because the Union has failed to provide admissible evidence to support its arguments in favor of summary judgment. (Pl.'s Mem. at 5-6). Rule 56(c)(2) of the Federal Rules of Civil Procedure states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Specifically, plaintiff filed a cross motion pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 to strike defendant's renewed motion for summary judgment. Local Rule 56.1 provides as follows:

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

Local Rule 56.1. Plaintiff claims that because there are "few citations, multiple statements of material fact in each paragraph, and many inferences," defendant "fails to heed the requirements"

of Rule 56 and Local Rule 56.1. (Pl.'s Mem. at 5).

However, defendant complied with this Rule by submitting Defendant's Local Rule 56.1 Statement of Material Facts in Support of Renewal Motion for Summary Judgment, filed on June 12, 2008. The Union has further provided affidavits and documentary evidence in support of its Rule 56.1 Statement of Material Facts. Therefore, plaintiff's motion to strike defendant's renewed motion for summary judgment is denied.

By letter dated January 22, 2008, plaintiff also moves pursuant to Federal Rule of Civil Procedure 36 to compel defendant to provide specific answers to plaintiff's first set of requests for admissions. Plaintiff states that she makes this motion because defendant acted in bad faith, as evidenced by a refusal to admit some facts that were adduced at depositions.[25]

However, based on a review of defendant's responses, it appears that on January 18, 2008, defendant responded in full to plaintiff's Request for Admissions. Rule 36(a)(4) states as follows:

> If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest. The

---

[25]As an example of defendant's deficient evidentiary support, Ms. Ayazi writes in her June 16, 2008 letter to the Court: "After discovery, Plaintiff filed requests for admissions. In pertinent part, Defendant admitted that the UFT would not have filed an appeal on a member's behalf 'unless it intends to represent the member.'" She claims that this statement was in direct contradiction to prior statements made by George Fesko that internal appeals given to plaintiff during discovery did not indicate that her grievances had been found to have merit. (See Defendant's Response to Plaintiff's First Set of Admissions, filed on January 18, 2008, ¶ 45). Although it is unclear what portion of Mr. Fesko's testimony she is referring to, any discrepancy between defendant's response to plaintiff's requests to admit and Mr. Fesko's testimony might be appropriate material for cross-examination but alone does not constitute a basis for striking defendant's motion.

17

> answering party may assert lack of knowledge or information as a reason
> for failing to admit or deny only if the party states that it has made
> reasonable inquiry and that the information it knows or can readily obtain
> is insufficient to enable it to admit or deny.

Fed. R. Civ. P. 36(a)(4). In reviewing plaintiff's requests to admit, the Court notes that certain

requests contain multiple statements of fact, some of which may be true, but because of the way

they are drafted make it difficult to admit or deny in full. To the extent that there exist

discrepancies between the testimony adduced during depositions and defendant's responses to

plaintiff's requests to admit, such discrepancies are properly addressed during cross-examination.

Having reviewed defendant's responses, the Court finds that its responses are adequate.

Accordingly, plaintiff's motion to compel is denied, and the Court will consider the facts

submitted by defendant in ruling on the motion for summary judgment.


D.  Jurisdiction Over the "R" Notation Claim

The claims currently before the Court include plaintiff's argument that her regular New

York City license was cancelled as the result of an alleged "R" notation placed on her file.

According to plaintiff, the "R" notation indicates that her medical status and her request for

medical accommodation were under review. (Pl.'s Disp. Facts ¶¶ 16-20).

As noted above, the district court held that "plaintiff never raised the issue of a 'medical

bar' being placed on her teaching license in her 2002 EEOC charge, so she cannot raise it in this

lawsuit." Ayazi v. United Federation of Teachers, No. 99-8222, Corrected Order of District

Court, Docket No. 62, at *2 (E.D.N.Y. March 12, 2004). As a result, defendant argues that this

Court lacks jurisdiction to hear plaintiff's claims that the UFT failed to represent her in her effort

18

to obtain teaching licenses which plaintiff believes were terminated due to this "R" notation placed on her license. (Def.'s Mem.[26] at 18).

"A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." Butts v. City of New York Dept. of Housing Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds, Hawkins v. 1115 Legal Service Care, 163 F.3d 684 (2d Cir. 1998). Although Butts related specifically to Title VII claims, its logic applies equally to claims brought under the ADA. See Mathirampuzha v. Potter, 548 F.3d 70, 77 (2d Cir. 2008); Williams v. New York City Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006); Harris v. Beth Israel Medical Center, No. 08 CV 11029, 2009 WL 612498, at *8 (S.D.N.Y. Mar. 4, 2009).

Upon further review of the 2002 EEOC complaint relating to the UFT, there appears to be a section in which plaintiff complained about "a notation" being placed on her teaching license which she described as "adverse medical information." (Ayazi Aff., Ex. 11 at 5). Specifically, the 2002 EEOC complaint states:

> On April 20, 1998, I learned from Mrs. Avila of Board of Education's Licensing Department that my teaching license (559B) could not be released to me because there was a problem with my medical status. Respondent [UFT] has refused to file a claim on my behalf even though Respondent's own Special Representative, Peter Mayglothling, states in a letter that a notation was placed on my teaching license 559B after I asked for a medical accommodation in October, 1996. Putting adverse

---

[26]Citations to "Def.'s Mem." refer to defendant's Memorandum of Law filed on June 24, 2008.

> medical information on a person's teaching license
> because and only because they ask for a medical
> accommodation is illegal. . . . I stated my concern to
> several of Respondent's Representatives and to
> EEOC.

(Id. at 4-5).

Concededly, the words "medical bar" or "R notation" do not appear in this description of

her claim with the EEOC. Thus, given the manner in which plaintiff described this claim in her

Amended Complaint, the district court found that plaintiff had failed to raise the issue of a

medical bar with the EEOC, precluding her federal claim in this suit. However, it has only

recently become clear, after further discovery and additional briefing, that plaintiff's claim in this

respect relates to the "R" notation placed on her license which she alleges acted as a medical bar

to her ability to retain various teaching licenses. Construing plaintiff's pro se papers liberally as

this Court must, see McPherson v. Coombe, 174 F.3d at 280, the Court finds that although the

EEOC complaint does not explicitly refer to a "medical bar," plaintiff's claims relating to the

"R" notation were sufficiently raised in the EEOC complaint, in that she complained to the

EEOC that her teaching license could not be released "because there was a problem with my

medical status." (Ayazi Aff., Ex. 11, Attach. at 4). She further notes that "a notation was placed

on [her] teaching license" after she requested an accommodation and yet the UFT failed to file a

claim on her behalf. (Id.)

Accordingly, the Court will consider these claims despite the earlier ruling that there was

no mention of a "medical bar" in her administrative complaint, which, while technically correct,

did not encompass the claim as now presented to the Court.

E. Test for Determining a Violation of the ADA by a Union

Plaintiff has alleged that the UFT discriminated against her because of her disability in violation of the ADA, 42 U.S.C. § 12101, et seq. In her motion papers, plaintiff advances two separate arguments: 1) that the defendant UFT discriminated against her specifically because of her disability by failing to challenge the Board's policies with respect to her request for an accommodation and with respect to the licensing notation (Pl.'s Mem. at 2-3); and 2) that the Union's policies had a disparate impact generally on persons with disabilities. (Id. at 3-4).

1) Claims of Discrimination against a Union

It is clear that a union may not discriminate against any of its members based on "race, color, sex, religion or national origin," 42 U.S.C. § 2000e-2(c)(1), and that a breach of the duty of fair representation may subject a union to liability under Title VII. See Agosto v. Correction Officers Benevolent Ass'n, 107 F. Supp. 2d 294, 303 (S.D.N.Y. 2000). Similarly, "[a] labor union may not discriminate against an individual because he or she has a disability within the meaning of the ADA." Nweke v. Prudential Ins. Co. of Am., 25 F. Supp. 2d at 220; see also Blaizin v. Caldor Stove #38, No. 97 CV 1604, 1998 WL 420775, at *2 (S.D.N.Y July 27, 1998) (holding that if a union commits a breach of its duty of fair representation, that may render it liable under the ADA or Title VII); Ross v. Comm. Workers of Am., Local 1110, 1995 WL 351462, at *5 (S.D.N.Y. June 9, 1995), aff'd, 100 F.3d 944 (2d Cir.), cert. denied, 519 U.S. 835 (1996).

The ADA prohibits discrimination in employment by a "covered entity" against qualified individuals based on disability. 42 U.S.C. § 12112(a). See Nweke v. Prudential Ins. of

21

America, 25 F. Supp. 2d at 221. There is no dispute that labor organizations, such as the UFT here, are covered entities under 42 U.S.C. § 1211(2). To establish a claim of discrimination under the ADA, a plaintiff must show that: (1) she is an individual with a disability as defined under the ADA; (2) she is otherwise qualified to perform the functions of her job title; and (3) she was subjected to discrimination because of her disability. See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998). There is no dispute that plaintiff qualifies as disabled under the ADA. (Def's. 56.1 Stmnt ¶ 2).

In order to establish a discrimination claim against the Union under the ADA, plaintiff must first establish that the Union: 1) breached its duty of fair representation, see Ross v. Comm'n Workers of America, 1995 WL 351462 at *5; see also McIntyre v. Longwood Central School Dist., 58 F. Supp. 2d at 421 (quoting Nweke v. Prudential Ins. Co. Of Am., 25 F. Supp. 2d 203, 220 (S.D.N.Y. 1998) (holding "it has been held that in order to establish a Title VII claim concerning representation by a union of its members interests, 'it is axiomatic that . . . there must be a finding that the [union] breached its duty of fair representation")), and 2) that the union's actions were motivated by discriminatory animus. See Vaughn v. Am. Tel. & Tel. Co., 92 Fed. Appx. 21, 23 (2d Cir. 2004); Morris v. Amalgamated Lithographers of America, Local One, 994 F. Supp. 161, 170 (S.D.N.Y. 1998).

a)  Duty of Fair Representation

Turning to the first element of the test, the Supreme Court has held that in order to establish a breach of the duty of fair representation, plaintiff must demonstrate that the union's

conduct was "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190

(1967). Conduct is not arbitrary unless "in light of the factual and legal landscape at the time of

the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be

irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991). Thus, a union "may

not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." Id. at 191.

On the other hand, a union member does not have an absolute right to have their

grievance taken to arbitration. Id. As the Supreme Court stated, "If the individual employee

could compel arbitration of his grievance regardless of its merit, the settlement machinery

provided by the contract would be substantially undermined, thus destroying the employer's

confidence in the union's authority and returning the individual grievant to the vagaries of

independent and unsystematic negotiation." Id. Courts have made it clear that "the duty of fair

representation is not breached where the union fails to process a meritless grievance, engages in

mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the

grievance." Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers, 34 F.3d 1148, 1153-

54 (2d Cir. 1994); see also Barr v. United Parcel Service Inc., 868 F.2d 36, 43-44 (2d Cir. 1989)

(holding that negligence or tactical errors on the part of the union are insufficient to show a

breach of the duty of fair representation). The Fifth Circuit has commented:

> [E]very union decision which may in some way result in overriding the wishes or
> disappointing the expectation of an individual employee, or even an appreciable
> number of employees, does not in and of itself constitute a breach of the fiduciary
> duty of fair representation. . . .Thus, where the union, after a good faith
> investigation of the merits of a grievance, concludes that the claim is insubstantial
> and refuses to encumber further its grievance channels by continuing to process
> the unmeritorious claim, its duty of fair representation may well be satisfied.

Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of America v. NLRB,

368 F.2d 12, 17 (5th Cir. 1966), cert. denied, 389 U.S. 837 (1967).

In Vaca v. Sipes, the Supreme Court concluded that the union had not breached its duty of fair representation because the union had represented its member employee into the fourth step of the grievance process and had decided that it would be unable to win a claim on his behalf. 386 U.S. at 176. The court found that the union did not "ignore" the complaint or process it "in a perfunctory manner." Id. at 195. Similarly, where the union negotiated a settlement that turned out in hindsight to be an inferior result to that which could have been obtained if the employees had simply terminated their strike, the Supreme Court held that there was no breach of the duty of fair representation. See Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. at 79.

In analyzing whether the Union here violated the duty of fair representation as to Ms. Ayazi, defendant UFT urges the Court to apply the test first enunciated by the Seventh Circuit in Bugg v. International Union of Allied Indus. Workers, Local 507, 674 F.2d 595, 599 n.5 (7th Cir. 1982). (See Def.'s Mem. at 1). Under the Bugg test, the plaintiff must demonstrate that: (1) she had a valid claim against the employer either pursuant to the collective bargaining agreement or statute; (2) that the union breached its duty of fair representation by failing to challenge the employer's violation; and 3) the union breached its duty because of plaintiff's disability. See id.; see also Ross v. Comm'n Workers of America, Local 1110, 1995 WL 351462 at *5. Although the Bugg test was enunciated in the context of a Title VII claim brought against a union, courts have applied the test to discrimination claims brought against a union under the ADA. See, e.g., Parker v. Metropolitan Transp. Authority, 97 F. Supp. 2d 437, 448 (S.D.N.Y. 2000).

Under the Bugg test, courts must initially determine whether the plaintiff has sufficiently alleged facts that demonstrate a valid claim against their employer – here, the BOE. However,

24

some courts have declined to apply this element of the Bugg test or have dropped the requirement that a plaintiff must actually prove that the employer committed a statutory or contractual violation. See Goldvekht v. United Federation of Teachers, No. 08-CV-1494, 2009 WL 129495, at *3 n.1 (E.D.N.Y. Jan. 20, 2009) (stating that the Bugg test's "requirement that a plaintiff actually prove a violation of the CBA in order to prevail against a union is also suspect"); Agosto v. Correctional Officers Benev. Ass'n, 107 F. Supp. 2d at 304 (declining to apply the Bugg test). As the court in Bryant v. Verizon Communications, Inc. explained, it is not necessary for the employer to have committed a violation in order to determine that the union discriminated against plaintiff. 550 F. Supp. 2d 513, 529 (S.D.N.Y. 2008). "This is so because it is possible for the union to discriminate against its members even when the employer acts within its rights." Id.

The cases that have applied the more lenient test require only a showing that: 1) the union breached its duty of fair representation by allowing an alleged breach by the employer to go unrepaired; and 2) that the union's actions were motivated by discriminatory animus. See Nweke v. Prudential Ins. of America, 25 F. Supp. 2d at 221 (citing Morris v. Amalgamated Lithographers of America, Local One, 994 F. Supp. at 170). Thus, under the more lenient test set forth in Goldvekht and Agosto, plaintiff need only allege a breach by the employer; she need not prove an actual breach by the employer. See Bryant v. Verizon Communications, Inc., 550 F. Supp. 2d at 529.

In this case, plaintiff has alleged numerous actions on the part of the Board that she claims are in violation of the ADA or in violation of the terms of the collective bargaining agreement. Among other things, she alleges that the BOE failed to provide her with a reasonable accommodation that would allow her to deal more effectively with her teaching obligations in

light of her disability; that the BOE placed an "R" notation on her file reflecting her request for a medical accommodation that resulted in the termination of her license; and that the BOE terminated her probationary status in violation of the terms of the collective bargaining agreement and did so because of her disability. With respect to plaintiff's claim of discrimination against the BOE based on the "R" notation, that claim is currently awaiting trial before the Honorable Nicholas G. Garaufis; in that case brought against the BOE, the district court found that there were material issues of fact in dispute that would preclude summary judgment.

Thus, although the Court expresses no view on the propriety of the Bugg test's first requirement, it appears that at least with respect to the licensing claim, plaintiff has raised material issues of fact regarding the employer's conduct, which if proved would satisfy the first element of the Bugg test. However, in examining each of plaintiff's claims against the UFT in this case, the Court has applied the more lenient test enunciated in the Bryant case and has considered only whether the UFT violated its duty of fair representation. See Bryant v. Verizon Commn's Inc., 550 F. Supp. 2d at 530. See also Nweke v. Prudential Ins. of America, 25 F. Supp. 2d at 221.

With respect to the Union, plaintiff claims that it violated the duty of fair representation in several ways: first, she alleges that the UFT subjected plaintiff to a different standard of review than was applied to other teachers when she pursued her challenge to the termination of her probationary status at Grover Cleveland High School. (Am. Compl. ¶¶ 35, 36, 39). She further alleges that the UFT was "complicit" in violations of plaintiff's due process rights during the Board's administrative hearings to review the discontinuance of her probationary service. (Id. ¶ 39). She also claims that the UFT failed to represent her when the Board retaliated against

26

her for seeking a reasonable accommodation. (Id. ¶ 37). Finally, she asserts that the UFT failed to represent her in challenging the illegal termination of her teaching licenses after a "medical bar" was placed on the licenses allegedly because plaintiff requested a reasonable accommodation from the Board. (Id. ¶ 38).

The facts relating to each claim are analyzed separately.


### 1) Unsatisfactory Performance Ratings

Turning first to plaintiff's claim that the Union breached its duty of fair representation in connection with her grievances as to the U rating, the Court finds that plaintiff has failed to set forth any facts to support a breach of the duty of fair representation or a finding that plaintiff was treated differently from other similarly situated Union members because of her disability. As noted in this Court's original Report and Recommendation, the evidence submitted at the time of the initial motion was insufficient to raise any material issues of fact regarding the Union's conduct with respect to handling Ms. Ayazi's grievances related to the unsatisfactory performance evaluations. The evidence is undisputed that the Union grieved each of Ms. Ayazi's claims regarding the unsatisfactory performance evaluations up to Step II of the grievance process. There is no claim that plaintiff was deprived of her right to due process with respect to any of these determinations. Although plaintiff alleges that during the grievance proceedings, certain unidentified UFT representatives made "useless and ineffectual" arguments (Am. Compl. ¶ 52), she still has provided no support for this claim and fails to set forth the nature of these allegedly ineffectual arguments.

Similarly, although she claimed that the UFT representative failed to challenge certain

27

procedures used in the evaluation process, plaintiff was given an opportunity to raise this concern during the grievance proceedings. There was no evidence presented during the initial motion for summary judgment to suggest that the Union violated its duty of fair representation by failing to pursue a challenge to the procedures used by the Board in the evaluation process, or that the Union's decision not to pursue this argument was the result of disability discrimination. Indeed, plaintiff invoked her right to appeal with respect to two of the evaluations; each of these appeals terminated with the Grievance Committee's determination not to pursue the March 25, 1997 and April 11, 1997 grievances any further. The third grievance, which plaintiff also appealed internally, was mooted by the Board of Education's determination to discontinue plaintiff from service.

Plaintiff argues that the Union discriminated against her and treated her differently from other similarly situated non-disabled teachers when it determined not to pursue her grievances to Step III of the process. It is undisputed that by letter dated June 10, 1997, the UFT informed plaintiff that a determination had been made not to pursue her grievances to Step III because, in the Union's view, the grievances lacked merit. (Def.'s 56.1 Stmnt ¶ 4; Ayazi Aff., Ex. 10; Fesko Aff.[27] ¶¶ 20-22). As George Fesko explained in his affidavit dated July 9, 2002, "[w]hile the employee has the right to invoke the grievance procedure at Step I and Step II, the labor agreement reserves to the UFT the right to decide whether grievances will be taken beyond Step II." (Fesko Aff. ¶ 12 (citing Art. 22(B)(1)(c) of the CBA)). If an employee seeks to have a grievance taken to Step III, the Borough Grievance Committee meets and if the decision is made

---

[27]Citations to "Fesko Aff." refer to the Affidavit of George Fesko, which was filed on July 9, 2002.

not to pursue it further, the member is notified that he or she may appeal to the UFT Grievance Committee, also known as "AdCom." (Id. ¶¶ 13-14). Review by the AdCom grievance committee is the last step in the internal UFT appeals process. (Id. ¶ 14). As Mr. Fesko explained, the UFT Borough Grievance Committee and AdCom Grievance Committee evaluate the merits of each case and consider not only the likelihood of success of a particular claim but also whether the dispute may be handled in another forum. (Id. ¶ 17). Thus, where a probationary teacher is facing possible discontinuance as a result of unsatisfactory classroom reports, she has another forum in which she can pursue grievances on the reports at the same time that she challenges the discontinuance. (Id. ¶ 18).

In this case, to the extent that plaintiff's claim is based on the UFT's decision not to pursue her grievances to Step III or to arbitration, the evidence presented in connection with the initial motion for summary judgment demonstrated that this decision was based on the Union's conclusion that plaintiff's claims were without merit. As the Court noted in its earlier Report, it is clear that a "union is under no obligation to process a grievance it determines to be meritless." Wilder v. GL Bus Lines, No. 99 CV 9992, 2000 WL 959751, at *4 (S.D.N.Y. July 11, 2000); see also Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d at 1153-54. Thus, while a union may not "'arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion,'" id. (quoting Vaca v. Sipes, 386 U.S. at 191), the union is given considerable latitude in evaluating the merits of a grievance, see id. at 1153-54, and "[j]udicial review of union action . . . 'must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.'" Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (quoting Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100,

29

1106 (2d Cir. 1991)).

While "[t]acit union acquiescence in an employer's discriminatory practices is sufficient to render it liable," United States v. City of Buffalo, 457 F. Supp. 612, 639 (W.D.N.Y. 1978), and a union may not discriminate against its members in refusing to handle claims with merit, the union has the discretion to refuse to pursue claims which it believes are without merit. See Vaca v. Sipes, 386 U.S. at 190. If the plaintiff proves that the union's conduct was arbitrary, discriminatory, or in bad faith, the plaintiff must then show a causal connection between the union's wrongful conduct and her injuries. White v. White Rose Food, 237 F.3d 174, 179 (2d Cir. 2001).

In this case, there is no evidence to refute the Union's assertion that it reviewed the merits of each of plaintiff's three unsatisfactory classroom observations. (Fesko Aff. ¶¶ 21-22). With respect to the March 25 and April 11, 1997 reports, the Borough Grievance Committee rejected plaintiff's request to proceed to Step III, finding that her "'case cannot be successfully pursued.'" (Id. ¶¶ 21, 22). With respect to the May 12, 1997 unsatisfactory classroom observation, the Borough Grievance Committee again rejected the claim on its merits and declined to pursue it to Step III. (Id. ¶ 23). In response to the defendant's first motion for summary judgment, plaintiff failed to provide any evidence to demonstrate that the Union's decision in each instance was not merit based. Although plaintiff was given an opportunity to engage in additional discovery and supplement her evidence in response to the Union's motion for summary judgment, she has made no showing that the Union's decision not to pursue her grievances over the three performance evaluations was based on her disability or on any reason other than the Union's evaluation of the merits of her claims.

30

However, plaintiff points to the fact that despite the letters that she received from the Union declining to pursue the grievances to Step III, the Union wrote to the Board with respect to the last two observation reports and indicated that the grievances would be pursued to Step III. Indeed, plaintiff points to the fact that an appeal was filed on her behalf by the Borough Representative after she had been informed by the Union that no appeal would be taken. She contends that this demonstrates that in fact, the UFT had determined that her grievances had merit, and when the Union subsequently refused to pursue the grievances, she claims it was due to discriminatory reasons.

Mr. Fesko explained in his affidavit that plaintiff had certain internal appeals rights which allowed her to seek Union review of the decision not to take the grievances to Step III. Thus, in order to give plaintiff time to pursue an internal appeal and preserve plaintiff's right to have the AdCom Grievance Committee review the determination not to proceed to Step III, the UFT informed the Board that a Step III grievance was being pursued. (Fesko Aff. ¶ 14). Although it is unclear why plaintiff believes that the UFT's action in filing the Step III grievances was not done to preserve her rights as indicated by Mr. Fesko or why this action supports her claim of discrimination, she argues that the UFT had in reality determined that the grievances had merit but that the Union had decided not to address the grievances in the customary fashion. (Pl.'s Br.[28] at 15-16). She claims that the Union had decided that the grievances would be determined at a BOE administrative hearing where the plaintiff would not be heard by an impartial arbitrator. (Id. at 16). Plaintiff argues that "the discrepancy between [the UFT's] own policy and practice

---

[28]Citations to "Pl.'s Br." refer to Plaintiff's Brief in Support of Opposition to Defendant UFT's Motion For Summary Judgment, filed on July 9, 2002.

with regard to Step III representations in the grievance procedure and [the Union's] conduct toward plaintiff" is evidence of the Union's animus. (Pl's. Br. at 13, 15). She states that "[g]iven the fact that other teachers had won the right to have their unsatisfactory classroom evaluations removed from their teachers' files for the exact contractual and policy violations perpetuated against plaintiff,"[29] the Union should have represented her in the Step III proceeding. (Id. at 15.) Plaintiff states that "[t]he only difference between plaintiff and these other similarly situated teachers is that they had not alleged disability discrimination." (Id.)

Apart from plaintiff's own allegations, there is no evidence in the record to support plaintiff's claim that the UFT had "secretly" determined that her claims had merit, nor is there any evidence supporting her claim that the Union had decided to send her claims to a BOE administrative hearing instead of an impartial arbitrator. The Union, through the affidavit of George Fesko, has explained the rationale behind the filing of an appeal to preserve plaintiff's rights and why such grievances are subsequently rejected at the conclusion of the process because of mootness. (Fesko Aff. ¶¶ 32-34). Not only has plaintiff provided no evidence to support her claim that the Union deviated from its policies and procedures in handling her claims, plaintiff has also failed to show that she was treated differently because of her disability. To the extent that she points to cases in which tenured teachers seek to challenge unsatisfactory observation reports, Mr. Fesko explained that there is a critical difference between the way unsatisfactory

---

[29]Although plaintiff's reference to "contractual and policy violations" is unclear, she states that her grievances "involved having these [evaluations] removed from her teacher's file for being unfair and inaccurate." (Pl.'s Br. at 14). She attaches one judicial opinion and two grievance decisions in which teachers successfully sought the removal of a U rating or an observation report from their files for the same reason. (Ayazi Aff., Ex. 2F). Mr. Fesko noted that the cases cited by plaintiff involved tenured teachers, while plaintiff was a probationary teacher at the time. (Fesko Aff. ¶¶ 35-36).

reports are dealt with for tenured and probationary teachers. This differential treatment does not reflect discrimination based on disability, but rather reflects on the difference in status: "as a probationary teacher facing discontinuance, she was in a completely different position than the tenured teachers that are the subject of the decisions she offers."[30] (Fesko Dep. ¶ 35) (emphasis in original).

Despite the opportunity to engage in additional discovery, plaintiff has failed to provide any new evidence to support her claim that her grievances were not processed in the same fashion as other grievances of this type, or that the Union pursued grievances on behalf of other probationary teachers even though their grievances had been determined to be without merit. Moreover, even if plaintiff was to demonstrate that tenured teachers were treated differently from probationary teachers with respect to the grievance process, that does not support her claim of disability discrimination under the ADA.

In her Memorandum of Law, plaintiff also asserts that she was treated differently from non-disabled members of the Union when George Fesko, the UFT liaison, arranged for plaintiff to have an expedited hearing on her discontinuance. (See Pl's. Mem. at 10). Plaintiff cites to the Bylaws of the Board of Education, under which a member has the right to waive the requirement that a discontinuance hearing be held within one year of termination if there are outstanding grievances that the member wants adjudicated before an unsatisfactory rating or discontinuance

---

[30]Fesko notes that "all probationary teachers subject to discontinuance–whether disabled or not–are treated the same in that their grievances over classroom reports are held in abeyance so that the performance issues may be addressed first in the discontinuance hearing . . . ." (Fesko Aff. ¶ 38). Pursuing grievances over observation reports "would have been pointless" given the timing of the discontinuance hearing and the fact that "the Board is not precluded by the disposition of the grievances from pursuing plaintiff's termination for unsatisfactory performance under its By-Laws." (Id. ¶ 37).

hearing. (Def.'s 56.1 Stmnt Ex. 6; Def.'s Admissions, Pl.'s 56.1 Stmnt Ex. 38 ¶ 43). Plaintiff contends that by expediting the discontinuance hearing, the Union deprived her of the right to choose to have all three grievance adjudicated prior to the hearing. (Id. (citing Pl's. 56.1 Stmnt ¶¶ 71, 72)).

Plaintiff further argues that the UFT mishandled her case when they forced her to proceed to the discontinuance hearing with all three negatives classroom evaluations in her file. (Pl.'s Mem. at 10). Although not clearly articulated in her papers, plaintiff seems to be arguing that if she had been given the opportunity to complete the grievance process on all three performance evaluations, those evaluations would have been removed from her file and she would not have had her probationary service terminated. Although she presents no evidence in this regard, plaintiff further claims that non-disabled members of the UFT who were similarly situated were given the right, if they chose, to have their grievances adjudicated prior to a discontinuance hearing.[31] (Id.)

Following the Court's recommendation that plaintiff be permitted to conduct additional discovery on her claims, plaintiff conducted the depositions of Howard Solomon, Director of the UFT Grievance Department since July 2001 (Solomon Dep.[32] at 9), and George Fesko, former Assistant to the UFT President. (Fesko Dep.[33] at 13-14). Among other issues raised with both

---

[31]Again, apart from plaintiff's unsubstantiated assertions, she has provided no evidence to show that non-disabled UFT probationary teachers were treated differently.

[32]Citations to "Solomon Dep." refer to the Deposition of Howard Solomon, filed on June 24, 2008, as Exhibit 19 to Defendant's 56.1 Statement of Material Facts.

[33]Citations to "Fesko Dep." refer to the Deposition of George Fesko, filed on June 24, 2008, as Exhibit 18 to Defendant's 56.1 Statement of Material Facts.

Mr. Solomon and Mr. Fesko, plaintiff questioned each with respect to the procedures for challenging unfavorable classroom evaluations and the rights of probationary teachers faced with termination or discontinuance as a result of an unsatisfactory rating. (See Solomon Dep. at 98-106; Fesko Dep. at 73-76).

Mr. Solomon explained that there were essentially two tracks for a member to follow when faced with unsatisfactory performance evaluations and a threatened discontinuance of service. (Solomon Dep. at 103-105). According to Mr. Solomon, a member can challenge the unsatisfactory performance evaluations through the grievance process, and the member can also raise a challenge to the evaluations during the course of the discontinuance proceeding itself. (Id.) Mr. Fesko noted that the outcome of the grievance process was not binding on the panel presiding over the discontinuance hearing (Fesko Aff. ¶ 37); thus, regardless of the outcome of the grievance process, the panel could still consider testimony from the reporting witnesses as to the teacher's unsatisfactory performance evaluations even if the grievances had been resolved in the teacher's favor. (Id. at 107-08; Fesko Aff. ¶¶ 33-34). According to Mr. Solomon, when a UFT member appealed a U Rating or discontinuance of service, they were required to have a hearing within one year. The member has a right to waive that one-year requirement if there were outstanding grievances that they wanted to have adjudicated before they went to the U Rating discontinuance hearing. (Id. at 103-04). Mr. Solomon confirmed that anyone who was entitled to a U rating or discontinuance hearing had the right to waive the one-year requirement. (Id. at 105).

Plaintiff argues that under Section 5.3.4 of the Board's Bylaws and in accordance with Mr. Solomon's testimony, she had the right to waive the one-year requirement and have her

outstanding grievances adjudicated prior to the U rating hearing. (Pl's. Mem. at 15-16). Although plaintiff claims that the Union "maliciously declared her grievances moot" (Am. Compl. ¶ 95), she cannot contest the fact that once she had been terminated, an arbitrator through the grievance process would have had no authority to overturn a separate independent decision of the Board to discontinue her probation. Similarly, plaintiff has presented no evidence to refute Mr. Solomon's testimony that the grievance procedure cannot result in the reinstatement of a probationary teacher even if all grievances are expunged. (Solomon Dep. at 127). The benefit to the grievance process would be that if the grievance process resulted in the expungement of the grievant's record, "it might be helpful at the hearing to be able to indicate that all of these bad things were expunged from your record . . . but that would not in and of itself get you back your job." (Id. at 128).

According to Mr. Solomon, the only procedure to obtain reinstatement is through the Office of Appeals and Review. (Id.) Ms. Ayazi has not presented any evidence to refute Mr. Solomon's testimony that it is up to the Union to decide whether a grievance will proceed to the Chancellor's level. (Solomon Dep. at 62). Nor has she presented any evidence to refute Mr. Solomon's testimony that the results of the U rating or discontinuance hearing are only advisory; thus, even if the hearing panel was to vote in favor of overturning the discontinuance, it would be nothing more than an advisory recommendation that the Chancellor could sustain or reject. (Id. at 108). In Ms. Ayazi's case, the recommendation made after the discontinuance hearing was to discontinue her probationary status, a recommendation that the Chancellor adopted. (Id. at 109).

Although plaintiff points to an alleged discrepancy in the testimony between Mr. Fesko and Mr. Solomon as to whether members of the Union were required to forego the grievance

procedure, plaintiff has failed to demonstrate that the Union violated its duty of fair representation when its expedited her discontinuance hearing. Even if she had proceeded forward with the grievance mechanism, there is no evidence to suggest that the third charge would have been expunged or more importantly, that a change with respect to that charge would have altered the Chancellor's ultimate determination. Indeed, Mr. Solomon's testimony makes clear that plaintiff was not deprived of the ability to challenge these performance evaluations; they were raised at her discontinuance hearing. (See Pl.'s 56.1 Stmnt, Ex. 16).

Negligence or tactical errors on the part of the Union are insufficient to show a breach of the duty of fair representation. Barr v. United Parcel Service, Inc., 868 F.2d 36, 43-44 (2d Cir. 1989). "The duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers, 34 F.3d 1148, 1153-54 (2d Cir. 1994). Thus, at best, even if the Court were to accept as true plaintiff's unsupported allegations that the UFT had "secretly" decided that her grievances had merit but then deprived her of her right to have these grievances heard by expediting the discontinuance hearing, she has not presented any evidence to demonstrate that these decisions were anything more than a tactical error that fails to rise to the level of a violation of the duty of fair representation. Taking the argument one step further, even assuming that plaintiff could demonstrate that the Union's conduct in this regard violated the duty of fair representation, plaintiff has presented no evidence to even suggest that the Union's actions were motivated by discriminatory animus based on her disability.

Similarly, as this Court noted in the prior Report, plaintiff has failed to present evidence

to support her claim that the Union violated its duty of fair representation when the UFT representative at her discontinuance hearing failed to argue that her poor performance had been caused by the Board's failure to provide her with a reasonable accommodation. The issue of plaintiff's disability and the need for an accommodation was raised at the time of the hearing. As plaintiff's own letter to George Fesko following the hearing makes clear, the Union "rep noted that I had overcome disability" and argued that "someone who had spent that long getting an education should not have their probationary service terminated." (Letter to George Fesko of Jan. 4, 1998 at 1-2; Def.'s 56.1 Stmnt, Ex. 5). She also conceded that she was allowed to present "circular 30 [concerning disability discrimination] and other documents to support my claim of disability." (Id.) Since the time the original Report was issued, plaintiff has failed to come forward with any new evidence to suggest that the Union violated its duty of fair representation in connection with her discontinuance hearing. Not only has she failed to raise a material issue of fact regarding the Union's representation but she has also failed to present any evidence to show that the UFT representative acted or failed to act because of her disability.

### 2) Plaintiff's Request for An Accommodation

Plaintiff also claims that the UFT violated its duty of fair representation when it failed to pursue plaintiff's claim of retaliation by the Board based on her request for an accommodation. Plaintiff appears to be claiming that because she requested an accommodation for her disability, the Board, in retaliation, refused to appoint her to a new teaching position. The Union contends that plaintiff has provided no evidence that the UFT failed to assist plaintiff with respect to her request for an accommodation. To the contrary, the Union argues that a Union representative

38

sent plaintiff information concerning the procedures to be followed in requesting a medical accommodation.[34] (Def.'s 56.1 Stmnt, Ex. 7). Plaintiff apparently followed these procedures and filed such a request. In a letter dated September 14, 1998, the Medical Bureau advised plaintiff that once she obtained employment in her license area, her request for an accommodation would be considered. (Def.'s 56.1 Stmnt, Ex. 8). At the time of this September 14, 1998 letter, plaintiff's probationary teaching position had already been terminated and she was not actually employed by the BOE. Thus, the Board's response–that they would consider her request once she had been hired to a new position–was reasonable. Absent an employment position there was no need for an accommodation. To the extent that plaintiff believed she was entitled to be re-hired as a consequence of her request for an accommodation, she has not provided any authority for that claim.

Indeed, Mr. Fesko repeatedly stated that a person with a substitute license does not have a right to be hired. While he testified that someone with a "license for appointment" who was on the appointment list would have the right to be hired, he clarified this testimony by explaining that it would not be an absolute right; the hiring decision would still be a matter of choice for the principal of the school. (Fesko Dep. at 86-88; Pl.'s Mem. at 17; Def.'s Rep. Mem.[35] at 7). Ms. Ayazi alleges that the Board's letter wrongfully conditioned consideration of an accommodation on her ability to obtain a job teaching in an elementary or intermediate school, despite the fact

---

[34]The procedures require the individual seeking an accommodation to first discuss the request with "the local school, district or office administrator." (Def.'s 56.1 Stmnt Ex. 7). In the alternative, the employee may formally apply in writing to the Board's Medical Bureau. (Id.)

[35]Citations to "Def.'s Rep. Mem." refer to Defendant's Reply Memorandum of Law, filed on August 22, 2008.

she possessed a license to teach ESL to adults and was at the time working as a per-session teacher.[36]

More importantly, even if plaintiff could establish that the BOE's response somehow violated the ADA, the Union points out that there is no evidence that after receiving that September 14, 1998 letter, the plaintiff sought the UFT's assistance in this regard.[37] When plaintiff did complain to George Fesko that she thought she was the subject of discrimination, Fesko advised plaintiff to file an EEOC charge. Plaintiff contends that she was told that if the EEOC accepted her charge, the UFT would assist her and she claims that Fesko indicated that the UFT would give plaintiff its "full backing." (Am. Compl. ¶ 69).

Defendant argues that the UFT could not provide deficient representation in this respect because such challenges were not subject to the grievance procedure. (Def.'s Rep. Mem. at 7). More specifically, the UFT denies that it promised to provide representation for Ayazi, noting that the UFT sent a letter to plaintiff on September 30, 1997, advising her that the Union would not act on her complaints because the collective bargaining agreement "did not permit the UFT to

---

[36]To the extent that she is now arguing that she was denied an accommodation in connection with her license to teach ESL to adults, she has never indicated what accommodation she was seeking when she made such a request, nor is there any evidence that she informed the Union of such a request and was therefore ignored by the Union.

[37]Ms. Ayazi says she did make the request, but that George Fesko refused to represent her with respect to her disability matters because she had filed a PERB complaint. (Ayazi Aff. at 16 (citing Def.'s 56.1 Stmnt, Ex. 2)). Although Ms. Ayazi made this claim in a subsequent PERB complaint, she has not presented any evidence either to corroborate her assertion or to demonstrate that the UFT's failure to act on this request, if it did, was due to her disability.

take the actions requested by plaintiff." (Def.'s 56.1 Stmnt ¶ 6). Since the last Report and Recommendation, plaintiff questioned both Union representatives, George Fesko and Howard Solomon, regarding the Union's ability to file a grievance against the Board of Education for a denial of a request for a medical accommodation. Mr. Solomon testified that at the time of plaintiff's request for an accommodation, there was no mechanism in the collective bargaining agreement for pursuing a grievance based on a denial of a request for an accommodation. (Solomon Dep. at 40-41). Instead, decisions concerning medical disabilities were made by the Medical Bureau of the BOE and the appropriate channel for challenging these decisions was through a medical arbitration. (Id.; Pl.'s Mem. at 16).

More importantly, insofar as plaintiff is claiming that the UFT failed to comply with its duty of fair representation by failing to pursue a grievance on plaintiff's behalf, plaintiff has not shown that she was actually denied an accommodation by the Board. The evidence is undisputed that at the time she received the Board's letter, she was no longer employed by the BOE and therefore, there was no need for an accommodation until she was hired for a new position. Thus, even if the UFT had the ability to file a grievance challenging a denial of a medical accommodation, plaintiff has failed to present any evidence to suggest that there was even a basis for a grievance. The crux of her argument seems to be that after her probationary status was terminated, she had the right to be rehired with an accommodation and that the UFT failed to pursue this claim for rehiring with the Board.

Finally, there is no evidence that the UFT engaged in tacit acceptance of disability

discrimination through the collective bargaining agreement. To the contrary, Mr. Fesko testified that "the union established a committee to help enforce the regulations that existed with respect to teachers or members with disabilities." (Fesko Dep. at 33). He personally engaged in discussions with the BOE in 1989 over procedures to address concerns of disabled teachers and to assist disabled teachers in obtaining accommodations. (Id. at 54). He further testified that if the Union was aware that a member had a disability and needed help, the Union would assist that member. (Id. at 43).

In its initial Report and Recommendation, this Court found that plaintiff had not only failed to allege the specifics as to her claim with respect to the Union's failure to pursue her request for an accommodation, but that she had also failed to present any evidence of discriminatory intent on the part of the Union. After considering the new evidence submitted since the last motion for summary judgment in 2002, the Court finds that plaintiff still has not submitted sufficient evidence to establish a breach of the duty of fair representation. See Crane v. Transport Workers Union of Greater New York, AFL-CIO, Local 100, No. 07 CV 750, 2008 WL 2743870 (S.D.N.Y. July 7, 2008) (granting defendant's motion for summary judgment dismissing claim alleging breach of duty of fair representation).


### 3) The "R" Notation

Plaintiff raises a slightly different claim with respect to her request for an accommodation. She claims that when she filed her request for a medical accommodation under

the ADA, the Board placed an "R" notation on her electronic personnel file that she claims constituted a "medical bar" and prevented her from obtaining new licenses and led to the cancellation of her teaching licenses. Specifically, she claims that as a result of the medical bar or R notation, she was issued a ESL Adult Education license instead of an ESL Secondary Education License. (Ayazi Aff. ¶ 14).

Certain facts with respect to this claim are not in dispute. On October 16, 1996, plaintiff made a request for an accommodation due to her disability, while she was employed at Franklin Lane High School (Pl.'s 56.1 Stmnt ¶ 13), and as of that date, her request was under review by the Medical Department of the BOE. (Id. ¶¶ 15-16; Pl.'s 56.1 Stmnt, Ex. 31 ¶ 7). Plaintiff claims that she did not learn that an "R" notation had been placed in her file until April 20, 1998, by which point she had already been terminated from her position at Grover Cleveland High School. (Pl.'s 56.1 Stmnt ¶ 90). Thereafter, she filed a salary grievance for the 1997-98 academic year, arguing that the "R" notation prevented her from being hired. (Pl.'s 56.1 Stmnt, Ex. 29). Plaintiff claims that the "R" notation, standing for "under review," was placed in her database under the result column (Pl.'s 56.1 Stmnt, Ex. 31 ¶ 7), and that this "R" notation interfered with the reissuance of her license leading to her termination under the lesser standard of termination allowed by a substitute license. (Ayazi Aff. ¶ 10).

The UFT disputes a number of plaintiff's factual assertions. First, it does not admit that the "R" notation was placed on her license in 1996 because she requested an accommodation. (Def.'s Resp. to Pl.'s. Req. to Admit ¶ 18). The Union also disputes plaintiff's claim that the "R" notation constituted a medical bar; rather, the "R" notation simply meant "'request under review.'" (Id.)

43

In addition to disputing plaintiff's factual assertions relating to the significance and impact of the "R" notation, the UFT contends that it did not even become aware of the alleged "R" notation until the Union received plaintiff's letter of May 11, 1998. (Def.'s 56.1 Stmnt, Ex. 2G). By that time, the "R" notation had already been removed.[38] Nevertheless, the UFT investigated plaintiff's complaints about the "R" notation, and sent its findings to plaintiff in a letter dated May 26, 1998. In that letter, UFT representative Peter Mayglothling explained that in the Fall of 1996, the "R" notation had been placed on Ms. Ayazi's file. The UFT letter stated that according to a representative from the BOE's medical division, all of plaintiff's medical licenses were cleared on December 19, 1996, but that inadvertently, the "R" notation was not removed until May 1, 1998. The UFT concluded that the "R" notation did not represent a block on plaintiff's employment since plaintiff remained employed during the time when the "R" notation remained in her file. (Def.'s 56.1 Stmnt, Ex. 2G). Indeed, the day after the "R" notation was removed, plaintiff was issued a new teaching license for ESL in Secondary Schools. (Pl.'s 56.1 Stmnt, Ex. 43). Although defendant admits that the Board denied plaintiff's application for a Fine Arts License on September 28, 1998, the Board cited the reason for the denial as being Ms. Ayazi's "record of full-time service based upon poor classroom management and ineffective instruction." (Def.'s 56.1 Stmnt ¶ 25). In his letter, Mr. Mayglothing indicated that he could find no basis for plaintiff's claims that her request for an accommodation and the "R" notation had resulted in the cancellation of her licenses. He wrote, "[Y]ou have yet to present any evidence that your inability to find full-time employment with the Board is due to any factor other than

---

[38]The "R" notation was actually removed on May 1, 1998.

44

your U-rating and discontinuance."[39] (Def.'s 56.1 Stmnt, Ex. 2G).

Whether or not plaintiff's allegations against the BOE have any basis in fact is unclear; that matter is currently pending before the district court in Ayazi v. Board of Education, No. 98-CV-7461. However, regardless of whether plaintiff can prove her claim against the Board with respect to the "R" notation, the question presented by this motion is whether there are material issues of fact in dispute as to whether the UFT, by failing to pursue a grievance on her behalf because of the "R" notation, violated the Union's duty of fair representation.

The UFT argues that it diligently investigated plaintiff's complaint about the issue once it was brought to the Union's attention. (See Def.'s 56.1 Stmnt ¶ 19). Plaintiff first complained about the "R" notation on May 11, 1998 and Peter Mayglothling conducted his investigation and provided a written response to plaintiff in a letter dated May 26, 1998, indicating that the "R" simply meant that her request for a medical accommodation was under review. The UFT contends, and it does not appear to be disputed, that by the time the UFT first learned about the "R" notation on May 11, 1998, the notation had already been removed from plaintiff's file on May 1, 1998. (Def.'s 56.1 Stmnt, Ex. 2G). Defendant further denies knowledge of any information suggesting that this R notation was a bar to plaintiff's employment, particularly since plaintiff was employed at Grover Cleveland while the "R" notation was on her file. (See id.) Therefore, the UFT contends that the "R" notation never acted as a block on her employment; the problems she experienced in obtaining a new appointment were due to the fact that her probation had been terminated as a result of the unsatisfactory performance reviews. (Id.)

---

[39]Ayazi claims that she gave the Union "a great deal of evidence" demonstrating that she "could not find full-time employment for reasons other than a discontinuance." (Ayazi Aff. at 17).

Despite the opportunity to conduct further discovery, Ms. Ayazi still has not produced any evidence to contradict Mr. Mayglothling's letter. Although plaintiff seems to rely on the deposition of George Fesko, his testimony provides no further evidence to support her claim that a medical bar prevented her from obtaining employment.[40] In the deposition, Mr. Fesko explained that having a license to be a substitute teacher does not indicate that that teacher has a "right to be hired." (Fesko Dep. at 84-85). He further explained that while a teacher who is on the "licenses for appointment" list would be eligible to be hired, that teacher would not have an absolute right to be hired (id. at 86-87); in other words, the license was necessary for eligibility to be hired but was not a guarantee of a job. When plaintiff asked Fesko, "If I was on an appointment list, had a license for appointment and I was on an appointment list, would the UFT have investigated whether or not my license was cancelled and why?" Fesko's response was, "I don't know as to whether the issue came up and as to why your license would be cancelled." (Id. at 89).

The undisputed facts demonstrate that the UFT considered plaintiff's complaints; they investigated her concerns, and attempted to provide her with an explanation based on the information gleaned from the Board. Plaintiff has presented no evidence beyond her claim that the UFT had access to her personnel screen to suggest that the Union was aware of the R notation prior to plaintiff's complaint. By the time the Union learned of the "R" notation on May 11, 1998, the notation had already been removed. Thus, there was no other action that the Union could have taken to remove the "R" notation and the only basis for challenging the Union's actions is plaintiff's claim that the Union failed to pursue a salary grievance on her behalf for the

---

[40]In fact, Mercuria Gibson, the Board's medical supervisor, denied that the medical screen could affect the validity of a license. (See supra at 3 n.6).

period during which she claimed she was unemployed due to the "R" notation.

On May, 6, 1998, the Queens Borough branch of the UFT initially denied plaintiff's request that the Union file a salary grievance on her behalf based on her claim that the "R" notation prevented her from obtaining employment.[41] (Pl.'s Mem. at 12). Thereafter, on June 2, 1998, the UFT Grievance Department denied plaintiff's request to file the salary grievance and on June 19, 1998, plaintiff wrote a letter to the UFT to appeal this decision.[42] (Pl.'s 56.1 Stmnt, Ex. 30). On February 5, 1999, the UFT informed plaintiff that they were denying her appeal because the evidence they possessed at that point would "not be sufficient to refute the claim by the Board of Education, NYC, that as a substitute [plaintiff] had no rights to be hired." (Id.) The Union asserts that it was within its rights not to proceed because it determined that her claims did not have sufficient merit. (See Pl.'s 56.1 Stmnt, Exs. 26-29).

As discussed supra at 27-30, a union does not violate its duty of fair representation when it declines to process a grievance that it determines has no merit, and the court's review of such a decision is "highly deferential." Spellacy v. Airline Pilots Ass'n Int'l, 156 F.3d at 126; see also Wilder v. GL Bus Lines, 2000 WL 959751, at *4. In this case, the Union, after a prompt investigation, determined that there was no evidence that the R notation constituted a bar to

---

[41]In essence, she claimed that she was entitled to reimbursement of her salary for the time following the discontinuance of her probationary status because if the "R" notation had not been there she would been given a job.

[42] Plaintiff contends the UFT did ultimately file a salary grievance with the BOE on behalf of plaintiff, seeking one year's salary based on the medical bar. (Pl.'s 56.1 Stmnt ¶ 92). In support of this claim, plaintiff provides a copy of a June 1, 1998 form letter sent by Elizabeth Languilli, the Queens Borough Representative, to the Board's Department of Human Resources, requesting a conference to discuss plaintiff's salary complaint. (Pl.'s 56.1 Stmnt, Ex. 29). Mr. Solomon concluded at his deposition that despite filling out the form, the Union had not filed the grievance. (Solomon Dep. at 60-61).

plaintiff's employment and that even if it had, plaintiff, as a probationary teacher, would have had no right to be hired in any event. In the absence of any evidence suggesting that the Union acted arbitrarily or with any discriminatory motive, the Court finds that the Union's actions in regard to the R notation were not violative of the duty of fair representation.

   b) Animus Motivated By Disability

   Assuming, arguendo, that plaintiff could establish a breach of the duty of fair representation, which she has not, her claims would nonetheless fail because she has not provided any evidence to show that the UFT was motivated by discriminatory animus based on her disability or that she was treated any differently from other probationary teachers under similar circumstances. See Bugg v. International Union of Allied Indus. Workers, Local 507, 674 F.2d at 599 n.5. Despite the opportunity to conduct additional discovery, plaintiff has not cited to any statement or action by the UFT that would support an inference that the Union was treating plaintiff differently because of her disability. Plaintiff does claim that George Fesko told another Union member that plaintiff was "too militant" (Pl's. Mem. at 18), but even if true, this remark, alone, does not establish that plaintiff was subjected to discrimination by the Union based on her disability. In the absence of remarks or actions based on plaintiff's disability, simple allegations of hostility by a Union official are not sufficient to support a claim that the Union acted with discriminatory intent. See, e.g., Gregory v. O'Neill, No. 00-CV-0660, 2002 U.S. Dist. Lexis 4825, at *18 (E.D.N.Y. Mar. 22, 2002); Johnson v. New York City Bd. of Ed., No. 96-CV-4472, 2000 WL 1739308, at *8 (E.D.N.Y. Oct. 10, 2000); Nwanji v. New York City Dept. of Environmental Protection, No. 98 CV 4263, 1999 WL 395412, at *4 (S.D.N.Y. June 15,

1999). In <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, the Supreme Court cautioned that:

> Even if plaintiff does not submit sufficient evidence of discrimination, [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

530 U.S. 133, 147 (2000). Here, however, even with the new evidence presented by plaintiff, there is no basis on which a reasonable jury could find a prima facie case of discrimination, much less disbelieve defendant's proffered explanation: namely, that it diligently reviewed each of plaintiff's claims and either pursued them or decided they were without merit. Neither the depositions or the admissions provided since the 2002 Report and Recommendation show any evidence of animus toward the plaintiff.

### 2) Disparate Impact Theory of Discrimination

Plaintiff also argues that the UFT's policies had a disparate impact on persons with disabilities. Specifically, she makes this claim in connection with the Union's decision to proceed to the discontinuance hearing prior to processing all of her grievances. Some courts have held that when the plaintiff is alleging a disparate impact theory of discrimination, it may be superfluous to require the plaintiff to show that the violation was motivated by plaintiff's disability. See <u>Agosto v. Correctional Officers Benev. Ass'n</u>, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2000) (noting that the third prong is "inapplicable to claims against a union under a disparate impact theory of discrimination"). Thus, the Supreme Court has held that a union may be liable under Title VII or 42 U.S.C. § 1981 when it "intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances

49

of success on other issues, or in deference to the perceived desires of its white membership. . . .regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities." Goodman v. Lukens Steel Co., 482 U.S. 656, 669 (1987), *superseded on other grounds by statute*, 28 U.S.C. § 1658(a), *as recognized in* Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004).

In this case, however, plaintiff has presented no evidence that the UFT handled the claims of disabled persons in a different manner than the claims of non-disabled persons. The fact that in plaintiff's case, the UFT made the decision not to pursue the outstanding grievances before the U-rating hearing does not mean that the Union breached its duty of fair representation or that it did so for discriminatory reasons. Although the decision may be criticized in hindsight as a tactical error or as the result of the UFT's negligence in failing to obtain Ms. Ayazi's consent, such an error does not constitute a violation of the duty of fair representation, see Barr v. United Parcel Serv., 868 F. 2d at 43-44, nor does it, without more, violate the ADA. It was a reasonable decision for the Union to attempt to resolve all grievances in one hearing, and it is clear that plaintiff was not deprived of any due process rights. (See discussion supra at 26-27.) In the absence of any evidence showing that the Union consistently treated members with disabilities differently or more specifically expedited their hearings but not those of disabled members, there is no basis on which a jury could base a finding of disparate impact.

Plaintiff also claims that the UFT and the Board were in a relationship that subjected members to discrimination in employment. (Pl.'s Mem. at 4). A labor organization can be held liable under the ADA for "participating in a contractual or other arrangement or relationship that has the effect of subjecting. . . .a[n] employee" to discrimination. 42 U.S.C. § 12112(b)(2).

Plaintiff argues that the UFT's contract with the BOE required teachers who needed a medical accommodation to first bring them to the attention of the local school and then submit them to the Medical Bureau of the BOE. (Def.'s 56.1 Stmnt ¶ 15). Plaintiff alleges that the Medical Bureau was placing medical notations on teachers' personnel files that acted as blocks to the members' ability to obtain licenses and employment. Plaintiff further claims the UFT became aware that a medical notation had been placed on plaintiff's file, but neglected to pursue a grievance because of it. (Pl.'s Mem. at 4).

As noted above, plaintiff has presented no evidence to suggest that the UFT was aware of the "R" notation prior to plaintiff's complaint nor is there any evidence to contradict the UFT's claim that by the time the UFT learned of the notation and contacted the Board, it discovered that the "R" notation on plaintiff's file had in fact been removed. Moreover, the UFT was told that the notation simply meant that plaintiff's request for a medical accommodation was under review. (Pl.'s 56.1 Stmnt, Ex. 2G). Not only has plaintiff failed to present any evidence contradicting the UFT's representations as to the results of its investigation, but she still has not shown that the notation constituted a block on her ability to teach, particularly since the notation was present on her file during the time plaintiff was actually employed by Grover Cleveland High School. (Id.)

Plaintiff also has failed to present any new evidence to suggest that the agreement between the Board and the UFT that required teachers to submit medical accommodation requests to the Medical Bureau of the BOE somehow discriminated against persons with disabilities. Nor has she demonstrated that the UFT "subjected" plaintiff to discrimination by entering into a contractual relationship that required teachers to submit medical accommodation

51

requests to the Medical Bureau of the BOE. Accordingly, the Court finds that plaintiff has failed to produce any evidence that would demonstrate discrimination based on a disparate impact theory.

## H. The Orlian Case

Plaintiff submits a recent case from the New York Supreme Court which she claims supports her position that she was terminated unlawfully. (See Pl.'s Letter dated Dec. 8, 2008 (citing Orlian v. New York City Dept. of Educ., 11 Misc.3d 1052, 814 N.Y.S.2d 891 (N.Y. Sup. Ct. 2006))). In Orlian, the Court was asked to decide whether the New York City Department of Education's decision to terminate a biology teacher was arbitrary and capricious. Id. at *5. The teacher was fired because the Department believed he only possessed a Preparatory Provisional Teacher (PPT) license when in fact he had obtained a Certified Provisional Teacher (CPT) license. Even though probationary teachers could be terminated at any time for any reason, the court ruled that they could not be terminated for a reason which did not apply to their classification. Id. Since the plaintiff in Orlian was terminated for being a PPT, when in fact he was a CPT, the court ruled that the decision to fire him had been arbitrary and capricious. Id.

Even if the plaintiff could establish that the Board terminated her because she was misclassified, this case is inapplicable to the issues here, which are based on whether or not the UFT breached its duty of fair representation under the ADA. To the extent that plaintiff cites this case to raise a new challenge to the termination of her probationary status, she failed to raise this claim in her Complaint in this action or in her complaint before the EEOC; she has also not alleged facts that would implicate the Union in any wrongful conduct. Most importantly, she has

not shown that the Union's actions had any connection to her disability.

I. Class Action Motion

By letter dated January 22, 2008, but not filed until February 19, 2008, plaintiff appears to move for certification of a class action in this case. Plaintiff requested that the Court "take appropriate and necessary actions" to allow her to file a class action suit. (Pl.'s Jan.[43] 2008 Let. at 1). In support of this request, plaintiff stated that evidence adduced in discovery "strongly suggest[s] that the UFT entered into a discriminatory arrangement with the employer, and chose to continue that arrangement knowing that it was adverse members protected by the Americans with Disabilities Act of 1990." (Id.)

Rule 23 of the Federal Rules of Civil Procedure lists four prerequisites for plaintiffs seeking to certify a class: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In support of plaintiff's motion for class action certification, she submits a case from the Second Circuit, Conroy v. New York State Department of Correctional Services., 333 F.3d 88 (2d Cir. 2003), remanded, Fountain v. New York State Dept. of Correctional Services, No. 99-CV-389, 2005 WL 1502146 (N.D.N.Y. June 23, 2005), where the plaintiff challenged the New York State Department of Correctional Services' ("DOCS") interpretation of the following

---

[43]Citations to "Pl.'s Jan. 2008 Let." refer to the letter to the Court from plaintiff dated January 22, 2008, which was filed February 19, 2008.

ADA provision:

> A covered entity [including labor unions] shall not require a
> medical examination and shall not make inquiries of an employee
> as to whether such employee is an individual with a disability or as
> to the nature or severity of the disability, unless such examination
> or inquiry is shown to be job-related and consistent with business
> necessity.

42 U.S.C. § 12112(d)(4)(A). In Conroy, the plaintiff alleged that DOCS had violated this provision by instituting a sick leave program that required employees to submit medical diagnoses after certain absences from work. Conroy, 333 F.3d at 91-92.

By contrast, in the instant case, the UFT has not violated this ADA provision because it never required plaintiff to undergo a medical examination. Indeed, plaintiff has not alleged that the Board violated this provision when it required all employees–not just disabled employees–to undergo a physical examination. Thus, Conroy is not controlling here. Even if plaintiff had raised a challenge similar to that in Conroy, she still has not provided the requisite information to establish that a class action is appropriate in this case. Plaintiff has submitted no evidence that would suggest how numerous a potential class may be or that her claims would be typical of the class. Merely coupling a claim that the defendant engaged in a pattern of wrongful conduct with a request for class certification is insufficient.

## CONCLUSION

Accordingly, having carefully reviewed all of the evidence prevented and drawing all inferences in favor of the pro se plaintiff, see Matsushita Electric, 475 U.S. at 577-78, the Court finds that there are no material issues of fact in dispute and grants defendant's motion for summary judgment. The Court further denies plaintiff's cross-motions in their entirety. The

Clerk of Court is Ordered to enter judgment in favor of defendant.

**SO ORDERED.**

Dated: Brooklyn, New York
      March 14, 2011

_Cheryl Pollak_

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York