UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
MARYAM AYAZI,

                  Plaintiff,

        - against -

UNITED FEDERATION OF TEACHERS,
LOCAL 2,

                Defendant.
----------------------------------------------------X

**MEMORANDUM
and ORDER**

99 CV 8222 (CLP)

On December 21, 1999, plaintiff Maryam Ayazi, proceeding pro se, commenced this

action against the United Federation of Teachers, Local 2 ("UFT" or the "Union"), alleging that

the UFT discriminated against her because of her disability, in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101 ("ADA"). Specifically, in her Amended Complaint, plaintiff

raised several causes of action against the UFT, arguing that the UFT: 1) failed to properly

represent her in challenging the Board of Education's decision to terminate her probationary

status by failing to raise the issue of disability during the termination proceeding; 2)

discriminated against her in violation of the ADA by declining to represent her in her requests for

an accommodation for her disability; 3) failed to represent plaintiff in challenging the illegal

termination of her teaching licenses based on what plaintiff has alleged was a "medical bar" that

was placed on her file when she requested an accommodation for her disability; and 4) subjected

her to a different standard in the treatment of her concerns than was applied to other members of

the UFT, based on her disability. (Am. Compl.[1] ¶¶ 104-13).

In a Memorandum and Order dated March 14, 2011, this Court[2] granted summary judgment in favor of defendant and Ordered the Clerk of Court to enter judgment in favor of defendant. On March 24, 2011, plaintiff filed a Motion for Reconsideration, contending that the Court overlooked certain evidence and made a number of factual errors in its Order, which resulted in the Court's decision to grant summary judgment. Defendant responded on May 10, 2011, arguing that "plaintiff fails to meet the stringent standard for a motion for reconsideration." (Opp.[3] at 2).

After considering the parties' submissions, plaintiff's Motion is denied.

## DISCUSSION

### A. Standards

Local Civil Rule 6.3 allows parties to file motions for reconsideration regarding "matters or controlling decisions which counsel believes the court has overlooked." "'The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion of the court.'" Lupo v. Comm'r of

---

[1]Citations to "Am. Compl." refer to plaintiff's Amended Complaint filed on May 30, 2001.

[2]On April 30, 2008, the parties consented to have the case referred to the undersigned for all purposes.

[3]Citations to "Opp." refer to defendant's Memorandum in Opposition, which was filed on May 10, 2011.

Social Sec., No. 07 CV 4660, 2011 WL 2036448, at *1 (E.D.N.Y. May 24, 2011) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

Generally, under Rule 6.3, courts have required that the movant "demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision." Ferrand v. Credit Lyonnais, 292 F. Supp. 2d 518, 520 (S.D.N.Y. 2003) (internal citations omitted); see also Byrne v. Liquid Asphalt Sys., Inc., 250 F. Supp. 2d 84, 88 (E.D.N.Y. 2003). Therefore, a moving party may not "advance new facts, issues or arguments not previously presented to the Court." Winkler v. Metro. Life Ins. Co., 340 F. Supp. 2d 411, 413 (S.D.N.Y. 2004) (quoting Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Maryland, 768 F. Supp. 115, 116 (S.D.N.Y. 1991)); see also Ferrand v. Credit Lyonnais, 292 F. Supp. 2d at 520 (holding that Rule 6.3 is "not intended as a vehicle for a party dissatisfied with the court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion"). Reconsideration of a prior order may also be appropriate "if the court's original order was ambiguous." Lotze v. Hoke, 654 F. Supp. 605, 607 (E.D.N.Y. 1987) (citing Kelly v. Pension Benefit Guar. Corp., No. 79 CV 0547, 1980 U.S. Dist. LEXIS 12458, at *1 (S.D.N.Y. July 17, 1980)).

The rule is to be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have already been considered fully by the court," Minkina v. Ashcroft, No. 01 CV 511, 2004 WL 1447947, at *1 (E.D.N.Y. June 25, 2004) (quoting Veloz v. State of New York, No. 98 CV 567, 1999 WL 642883, at *2 (S.D.N.Y. Aug. 24, 1999)), and such a motion must not be used as a substitute for an appeal. See Ferrand v. Credit Lyonnais, 292 F. Supp. 2d at 520. Instead, the rule is an "extraordinary remedy to be employed sparingly in the

3

interests of finality and conservation of scarce judicial resources." Winkler v. Metro. Life Ins. Co., 340 F. Supp. 2d at 412 (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). Rule 6.3 was designed to provide a mechanism "to 'correct a clear error or prevent manifest injustice.'" Jordan v. Metro. Life Ins. Co., No. 03 CV 4110, 2004 WL 1752822, at *2 (S.D.N.Y. Aug. 4, 2004) (quoting Doe v. New York City Dep't of Social Servs., 709 F.2d 782, 789 (2d Cir. 1983), cert. denied, Catholic Home Bureau v. Doe, 464 U.S. 864 (1983)); see also Belmont v. Associates Nat'l Bank, 219 F. Supp. 2d at 343.

## B. Plaintiff's Claims

In order to understand plaintiff's arguments in support of her motion for reconsideration, it is necessary to briefly outline her allegations against the Union and the rationale behind this Court's determination that defendant's summary judgment motion should be granted.

Plaintiff's first claim stems from the Board of Education's decision to terminate her status as a probationary teacher based on three unsatisfactory performance evaluations that she received between March and May of 1997, while she was teaching English as a Second Language at Grover Cleveland High School. With respect to her claim that the Union breached its duty of fair representation and discriminated against her in the way that it pursued grievances on her behalf in response to these three unsatisfactory performance evaluations, the Court found that there was no evidence that plaintiff was treated differently from any other similarly situated Union members because of her disability. The undisputed evidence showed that the UFT had pursued grievances on each of the three performance evaluations through Step II of the grievance process, but had then determined not to pursue her grievances to Step III because the grievances lacked

4

merit. (Def.'s 56.1 Stmnt ¶ 4[4]; Ayazi Aff.,[5] Ex. 10; Fesko Aff.[6] ¶¶ 20-22). Although plaintiff argued that the UFT's decision not to pursue the grievances to Step III was based on disability discrimination, plaintiff presented no evidence to support that argument, nor did she present any evidence that other probationary teachers who were not disabled had been treated differently.

Plaintiff's second claim is that the Union discriminated against her by failing to represent her in pursuing her claim of retaliation by the Board based on her request for an accommodation. In essence, plaintiff's claim was that because she asked for an accommodation, the Board retaliated against her by refusing to appoint her to a new teaching position after she was terminated from her position at Grover Cleveland. Despite the lack of evidence to support her claim, the Court assumed for purposes of the motion that the Board in fact retaliated in the fashion alleged. Nevertheless, the evidence presented failed to demonstrate that the Union had not assisted plaintiff in seeking an accommodation from the Board or in her efforts to be rehired. Indeed, pursuant to information provided by the Union, plaintiff requested a medical accommodation from the Board, which sent her a response in September 1998 – after the termination of her position at Grover Cleveland – indicating that once she obtained employment in her license area, her request would be considered. Plaintiff presented no evidence that after receipt of this letter, she requested any further assistance from the Union. Accordingly, the Court

<hr>

[4]Citations to "Def.'s 56.1 Stmnt" refer to Defendant's 56.1 Statement filed on June 24, 2008.

[5]Citations to "Ayazi Aff." refer to Ms. Ayazi's Affidavit in Opposition to Defendant UFT's Local Rule 56.1(a) Statement of Material Facts, dated May 29, 2002.

[6]Citations to "Fesko Aff." refer to the Affidavit of George Fesko, which was filed on July 9, 2002.

5

found no basis on which to assert discrimination claims against the Union.

Plaintiff also raised a claim that when she filed for a medical accommodation, the Board placed an "R" notation on her file that constituted a "medical bar," which prevented her from obtaining new licenses and resulted in the cancellation of her teaching licences. The Union disputed plaintiff's claim that this "R" notation was a medical bar but, once alerted to the issue by plaintiff, conducted a full investigation of her claims. To the extent that plaintiff claimed that the Union discriminated against her or somehow failed to represent her adequately with respect to this "R" notation, the Court found that by the time the Union was asked to look into the problem, the "R" notation had been removed from her file. Thus, there was no basis to hold the Union liable for discrimination or breach of duty based on this allegation.

Finally, the Court held that plaintiff had failed to present any evidence that she was treated differently by the Union because of her disability. There was no evidence of discriminatory animus presented, nor was there any evidence of disparate impact. Accordingly, summary judgment was appropriate.

In moving for reconsideration, plaintiff argues that there is certain evidence that the Court overlooked and a number of specific errors committed by the Court in analyzing the record evidence. The Court has carefully considered each of plaintiff's alleged errors and finds that there is no basis for reconsideration of the March 14, 2011 Order.


C.  Failure to Consider Solomon's Testimony

Plaintiff's first argument is that the Court overlooked direct evidence of disability discrimination. Specifically, she contends that she submitted "direct evidence of disability

6

discrimination, namely, defendant's [*sic*] Solomon's[7] admission at deposition that the UFT will not challenge a decision made by the Board's medical department where it concerns accommodation requests." (Mot.[8] at 4-5). Plaintiff argues that this "direct evidence, coupled with strong circumstantial evidence, raises a fact question as to whether defendant United Federation of Teachers intentionally avoided pursuing Plaintiff's grievances through the CBA because it would have required the union" to challenge the employer with regard to its compliance with the ADA.[9] (Id. at 5).

Plaintiff appears to refer to the testimony of Howard Solomon, Current Director of the UFT Grievance Department, who testified that one "can't file a grievance for the denial of an accommodation," because "[i]t's not a grievance . . . That is a medical issue with the medical bureau, and as a result, they have the authority and jurisdiction to determine whether or not the accommodation is warranted based upon the medical documentation that is provided to them." (Solomon Dep.[10] at 40-41). Solomon explained that "the grievance machine does not provide [a mechanism] for us to challenge [a denial of an accommodation], except for a medical arbitration

---

[7]It should be noted that Howard Solomon is not a named defendant in this case; only the UFT is named as a defendant.

[8]Citations to "Mot." refer to plaintiff's Motion for Reconsideration, which was filed on March 24, 2011.

[9]It is unclear what the plaintiff is suggesting that the Union should have done. When plaintiff raised the issue of her need for an accommodation, it was George Fesko who recommended that she file an EEOC charge against the Board. To the extent that she is arguing that the Union was required to file a federal lawsuit on her behalf under the ADA, it is unclear that the Union would have had standing or that it had any such obligation under the CBA.

[10]Citations to "Solomon Dep." refer to the deposition of Howard Solomon, which was filed on June 24, 2008, as Exhibit 19 to Defendant's 56.1 Statement of Material Facts.

and medical determination by the medical bureau, which is a different process completely." (Id. at 41).

From this testimony, plaintiff draws the inference that the Union "will not challenge a decision made by the Board's medical department where it concerns accommodation requests." (Mot. at 5). However, a more careful reading of the testimony cited by plaintiff makes clear that Mr. Solomon stated only that the Union would not file a *grievance* regarding medical accommodations, not that the Union flatly refused to challenge denials of requests for accommodation. Indeed, Mr. Solomon stated that any such challenge is "not a grievance," and made it clear that "a different process" exists for challenging accommodation denials. (Solomon Dep. at 40-41).

Thus, apart from the fact that the Court carefully considered the testimony of Mr. Solomon in issuing its March 14, 2011 Order and thus this evidence was not "overlooked," the Court, upon reconsidering plaintiff's arguments, continues to find that the cited evidence does not support plaintiff's claim that the Union was engaged in disability discrimination when it declined to file a grievance on her behalf as a result of the Board's conduct with respect to her request for an accommodation.

## D. Alleged Errors

In an appendix to her Motion, plaintiff has listed 16 "Errors" and "Corrections," describing what she believes are factual inaccuracies in the Court's opinion granting defendant's summary judgment motion. In most cases, the alleged error does not affect the Court's ultimate decision. In some, the inferences drawn from plaintiff's evidence are unreasonable. The Court

8

addresses each alleged "Error" in turn.

### 1) Alleged Error Nos. 1 & 2

In granting defendant's motion for summary judgment, this Court found that "to the extent that plaintiff's claim is based on the UFT's decision not to pursue her grievances to Step III or to arbitration, the evidence presented in connection with the initial motion for summary judgment demonstrated that this decision was based on the Union's conclusion that plaintiff's claims were without merit." (Mem. & Order[11] at 29). Although the Union challenged each of the three unsatisfactory performance reports through Step II of the grievance process, the UFT advised plaintiff by letter dated November 10, 1997 that it would not proceed to Step III because, in the Union's view, the grievances lacked merit. (Def.'s 56.1 Stmnt ¶ 4).

In seeking to demonstrate error on the part of the Court, plaintiff argues that the Court failed to consider evidence that demonstrates that the Union did not find her grievances to be lacking in merit. She points to the Court's observation that, despite the Union's letter, it "wrote to the Board with respect to . . . two observation reports and indicated that the grievances would be pursued to Step III." (Id. at 31). Plaintiff contends that Union guidelines state that an appeal is filed only if the grievance committee determines that a grievance has merit. Therefore, plaintiff argues that if the Union notified the Board that the grievances were being pursued, the Union must have determined that plaintiff's grievances had merit. (See Mot., Appx. A at c).

In what plaintiff argues is "Error No. 1," the Court concluded that "[i]n response to the

---

[11] Citations to "Mem. & Order" refer to this Court's Memorandum and Order granting defendant's Motion for Summary Judgment, which was issued on March 14, 2011.

9

defendant's first motion for summary judgment, plaintiff failed to provide any evidence that the Union's decision was not merit based." Plaintiff's argument that because an appeal was filed on her behalf, the Union must have decided that her claim had merit, ignores the Union's explanation for why it filed the appeal. The plaintiff's Union representative, George Fesko, explained that despite the lack of merit in Ms. Ayazi's case, the UFT told the Board that the Union would pursue a grievance to Step III as a procedural matter to preserve Ms. Ayazi's rights while she pursued an administrative appeal within the Union. Mr. Fesko "explained in his affidavit that . . . in order to give plaintiff time to pursue an internal appeal and preserve plaintiff's right to have the AdCom Grievance Committee review the determination not to proceed to Step III, the UFT informed the Board that a Step III grievance was being pursued." (Mem. & Order at 31 (citing Fesko Aff.[12] ¶ 14)). It appears that if plaintiff's internal appeal had been successful and the UFT had *not* taken these steps to inform the Board, she would have been unable to take her claim to Step III.

In "Error No. 2," plaintiff challenges Mr. Fesko's explanation for the filing of the Step III grievance. According to plaintiff, his explanation contradicts the admission by defendant that "the Queens Borough Grievance Committee does not file appeals on behalf of members to the Chancellor's level unless it intends to represent the member." (Id. at c-d). It is unclear why the plaintiff believes that the policy, cited by Fesko, of preserving an employee's right to proceed against the Board until after she has pursued her internal union appeals, is at odds with the notion that the Grievance Committee does not file appeals unless it intends to represent the member. In

---

[12]Citations to "Fesko Aff." refer to the Affidavit of George Fesko, which was filed on July 9, 2002.

10

essence, what Fesko was saying was that during the time that plaintiff was given to ask the Committee to reconsider its decision not to pursue her grievance, the Union wanted to ensure that if she was successful and the Committee decided to support her to the next level, that she would not have lost that opportunity with the Board. Again, the Court considered this argument and found that "it is unclear why plaintiff believes that the UFT's actions in filing the Step III grievances were not done to preserve her rights as indicated by Mr. Fesko . . . ." (Mot., Appx. A at c). In the end, after exhausting her internal appeals, the Union determined not to pursue the Step III grievance with the Board because the issue was "moot," given that plaintiff's probationary status had already been discontinued by the Board. (Pl.'s 56.1 Stmnt, Exs. 27, 28).

In summary, these are not arguments that the Court overlooked at the time of the initial motion. Rather, the Court found that the despite the policy cited by plaintiff, the undisputed evidence supported a finding that the Union had consistently taken the position that plaintiff's grievances were without merit. Plaintiff produced no evidence that Mr. Fesko's explanation was false, or that the Union had decided that her case in particular had merit.

### 2) Alleged Error No. 3

Plaintiff asserts that the Court erred when it stated that "[a]part from plaintiff's own allegations, there is no evidence in the record to support plaintiff's claim that the UFT had 'secretly' determined that her claims had merit . . . ." (Mot., Appx. A at d). In support of her contention that the Court erred, plaintiff cites a number of paragraphs from her Statement of Disputed Facts in Opposition to Defendant's Motion, as well as the Union's admission that "George Fesko met with Plaintiff in his office and stated that he had discussed her case with

11

Howard Bloch, and that they both agreed the UFT would give her their backing." (Id.)

The statements plaintiff cites are not inconsistent with the Court's finding. Plaintiff presents no evidence to suggest that Fesko's and Bloch's statement that they would "give her their backing" meant that they had "determined that her claims had merit." As noted above, the UFT consistently took the position that plaintiff's claims were meritless. Nothing in the Requests to Admit, which plaintiff drafted, explains what was meant by their "backing," nor is it clear from the Request that the conversation even related to the Union's support of plaintiff in challenging her performance reviews. Their "backing" could have referred to the fact that the UFT would support her as a member in her requests for an accommodation from the Board for her disability.

Plaintiff also cites defendant's response to her charge before the Public Employee Relations Board ("PERB"), although plaintiff does not specify which part of the response buttresses her claim. In her charge before the PERB, plaintiff alleged that the UFT's decision not to pursue her claim "was arbitrary because it failed to evaluate the merits of my claim." (Def.'s 56.1 Stmnt[13], Ex. 2 at 3). This statement belies her current claim that the Union "secretly" determined her claims had merit; instead, before the PERB, she claimed that the Union was guilty of failing to thoroughly investigate and evaluate her claim. Once again, these arguments were raised previously and plaintiff has not shown that the Court's statement was in error.

---

[13] Citations to "Def.'s 56.1 Stmnt" refer to Defendant's 56.1 Statement filed on June 24, 2008.

3) <u>Alleged Error No. 4</u>

Plaintiff contends that the Court erred when it stated that plaintiff "has made no showing that the Union's decision not to pursue her grievances over the three performance evaluations was based on any reason other than the Union's evaluation of the merits of her claims." (Mot., Appx. A at d). Plaintiff cites a number of statements which plaintiff apparently argues are evidence of discriminatory animus. However, as a general matter, all of the statements cited by plaintiff relate to the question of whether the Union had a duty to grieve her request for an accommodation; none of the cited statements relate to the Union's decision not to pursue the grievances as to her performance.

Specifically, plaintiff argues that Howard Solomon's testimony contradicts the Court's conclusion. Solomon stated:

> You can't file a grievance for the denial of an accommodation request . . . because that is a medical issue with the medical bureau, and as a result, they have the authority and jurisdiction to determine whether or not the accommodation is warranted . . . and the grievance machine does not provide for us to challenge, except for a medical arbitration and medical determination by the medical bureau, which is a different process completely.

(Mot., Appx. A at e (citing Solomon Dep. at 40-41)). It appears that Mr. Solomon was stating that the denial of a medical accommodation is not handled through the normal grievance procedure.

It is clear that the grievances referred to by the Court in this sentence in the Order were the grievances regarding plaintiff's classroom performance evaluations, not grievances regarding her requests for medical accommodations. Indeed, plaintiff explicitly states that the Union "breached its duty of fair representation in connection with her grievances as to the U rating . . .

13

." (Mem. & Order at 27). The U rating was based on problems with her performance as a teacher.

Similarly, plaintiff also cites the Union's statement that "[n]o grievances have been filed by any bargaining unit member alleging that the Board of Education failed to accommodate the member, and there have therefore been no occasions in which the union representatives have been called upon to render 'representation' or 'assistance' in the grievance procedure to 'get an accommodation' for an employee." (Mot., Appx. A at e (quoting Pl.'s 56.1 Stmnt[14], Ex. 34, Interrogatory 1)). Plaintiff contends that this answer "confirm[s] that the UFT did not use the grievance procedure to challenge disability discrimination." (Mot., Appx. A at e). Again, this statement by the Union has no bearing on whether it declined to pursue her performance evaluations on the merits. Moreover, this statement is not evidence if discriminatory animus. While the Union has made it clear that it did not use the grievance procedure to obtain medical accommodations or challenge the denial of one, this does not mean or even suggest that the Union never challenged disability discrimination in any form. As Mr. Solomon testified to at his deposition, there was a "different process completely" for challenging a denial of an accommodation, not that there was no process in place for doing so.

Plaintiff also notes that the Union stated that Mr. Fesko's "Capably Disabled Committee does not represent members in any disputes with the Board of Education, and does not communicate with the Board of Education on behalf of individual UFT members. If a UFT member requires assistance in obtaining an accommodation," Mr. Fesko or Mr. Rubin would

---

[14]Citations to "Pl.'s 56.1 Stmnt" refer to Plaintiff's 56.1 Statement filed on August 7, 2008.

14

advise the member and, "depending on the situation, speak with representatives of the Board of Education on the member's behalf." (Id. at e (quoting Def.'s 56.1 Stmnt, Ex. 1)). This statement not only is irrelevant to the Union's actions in challenging plaintiff's unsatisfactory performance evaluations, but it also does not support plaintiff's claim of discriminatory animus. Instead, it simply notes that the Capably Disabled Committee served in a different capacity than advocate; rather, it operated as a liaison and information center for disabled members. Nowhere has plaintiff cited evidence suggesting that disabled members would be unrepresented either in challenging medical accommodations or in pursuing any other sort of grievance.

Lastly, plaintiff cites a letter sent by the Union outlining its efforts on behalf of disabled members. It is unclear what plaintiff contends this evidence implies.

Accordingly, the evidence submitted by plaintiff does not demonstrate that the Court erred when it stated that plaintiff "has made no showing that the Union's decision not to pursue her grievances over the three performance evaluations was based on any reason other than the Union's evaluation of the merits of her claims." (Mot., Appx. A at d). Nor does any of the evidence cited by plaintiff support a finding or even an inference of discriminatory animus.

### 4) Alleged Error No. 5

Plaintiff claims that the Court erred when it stated that "[a]lthough plaintiff claims that the Union 'maliciously declared her grievances moot,' she cannot contest the fact that once she had been terminated, an arbitrator through the grievance process would have had [no] authority

15

to overturn a separate independent decision of the Board to discontinue her probation."[15] (Mot., Appx. A at f (quoting Mem. & Order at 36)).

Plaintiff cites four pieces of evidence in support of her contention that this statement was an error, but it is unclear how the evidence cited by plaintiff contradicts the Court's statement, or even how the evidence is at all related. Accordingly, there is no basis for reconsidering this statement. Moreover, even if this statement was somehow in error, it is unclear how this affected the outcome of the Court's determination.

### 5) Alleged Error No. 6

Plaintiff contends that the Court erred when it found that "plaintiff has presented no evidence to even suggest that the Union's actions were motivated by discriminatory animus based on disability." (Mot., Appx. A at f). Plaintiff argues that the deposition testimony of Howard Solomon shows that the Union intentionally avoided bringing grievances based on disability. Specifically, plaintiff cites Solomon's statement that "I don't deal with the ADA. That is not something that I have reason to take up in the grievance process. The ADA is not in our book," as well as Solomon's statement that "I personally have never filed a grievance for a member on a handicapping condition. *I never had a reason to*." (Id. at f-g) (emphasis added).

As discussed supra at 7-8, Solomon's testimony is not evidence, direct or circumstantial, which would give rise to an inference that the Union's decisions with respect to plaintiff were

---

[15]Plaintiff misquotes the Memorandum and Order. Although the Court's opinion states that the arbitrator "would have had no authority to overturn a separate independent decision of the Board," plaintiff's Motion for Reconsideration quotes the Court as saying that the arbitrator "would have had the authority to overturn a separate independent decision of the Board." (See Mem. & Order at 36; Mot., Appx. A at f).

16

motivated by discriminatory animus. Indeed, it should be noted that Solomon never actually dealt with plaintiff's case; he became the Director of the UFT Grievance Department in 2001, after the termination of plaintiff's probationary status. (Solomon Dep. at 9). His statement merely indicates either that during the time he has held this position, he was not required to deal with a claim that the employer had engaged in disability discrimination, or that there was another mechanism for dealing with disability discrimination in which he was not involved. Indeed, as discussed supra, Solomon specifically testified that appeals of accommodation decisions were handled by procedures outside the grievance process. (See discussion supra at 7, 8, 13).

The evidence cited by plaintiff therefore does not give rise to any reasonable inferences in tension with the Court's finding that plaintiff has not provided any evidence to establish discriminatory animus.

### 6) Alleged Error No. 7

Plaintiff contends that it was error for the Court to conclude that "plaintiff has failed to come forward with any new evidence to suggest that the Union violated its duty of fair representation in connection with the discontinuance hearing" and that she "failed to present any evidence to show that the UFT representative acted or failed to act because of her disability . . . ." (Mot., Appx. A at h). In support of her contention that the Court erred, plaintiff cites the opinion of the New York Supreme Court, Kings County, which held that, at plaintiff's first discontinuance hearing, "there was no evidence or testimony produced which had a direct bearing either on the accommodations given to her, or on the assistance or training given to her." (Id. at h-i). This statement was made in connection with the court's finding that the Board of

17

Education had failed to properly inform plaintiff of her right to present evidence at the hearing; read in context, it was not a condemnation of the Union representative who accompanied plaintiff to the discontinuance hearing. (See Def.'s 56.1 Stmnt, Ex. 11 at 7) ("Consequently, in this instance, petitioner's substantial right to call witnesses and present evidence was violated by the BOARD OF EDUCATION's[16] failure to comply with its own By-Laws . . . .").

Moreover, as plaintiff concedes, there was a second State Court hearing held as a result of the Board's failure, and that "[a]t the second State Court remanded hearing . . . the new UFT representative raised the issue of accommodation and the issue of training." (Mot., Appx. A at i). Accordingly, nothing in plaintiff's purported "Correction" demonstrates that the Court erred in its statement that plaintiff had failed to show that the Union representative violated the duty of fair representation. Moreover, a review of the entire record makes it clear that plaintiff failed to provide any evidence, either in her opposition to defendant's Motion for Summary Judgment or her purported "Correction," that the UFT representative "acted or failed to act because of her disability." Accordingly, the Court finds that plaintiff has not shown any error.

### 7) Alleged Error No. 8

Plaintiff claims that the Court erred when it stated that on September 14, 1998, "plaintiff's probationary teaching position had already been terminated and she was not actually employed by the BOE. Thus, the Board's response – that they would consider her request once she had been hired to a new position – was reasonable." (Mot., Appx. A at i (quoting Mem. & Order at 39)). Plaintiff argues that the Court was incorrect, as she "had worked continually as a

---

[16]The words in all capital letters reflect plaintiff's use of capital letters in her papers.

18

PER SESSION teacher in a regular classroom job working six hours a week since February of 1998." (Id.)

There is no dispute that plaintiff was employed by the BOE during this period as a per session teacher. It is also undisputed that at the time the medical bureau sent plaintiff the September 14, 1998 letter, plaintiff's position as a probationary teacher at Grover Cleveland had been terminated. However, the only request for an accommodation made by plaintiff was in connection with her license to teach ESL at the secondary level at Grover Cleveland. Thus, when the Board informed plaintiff that "once she obtained employment in her license area, her request for an accommodation would be considered," it appears that the Board was dealing solely with the request for accommodation made while she was at Grover Cleveland. (Mem. & Order at 39). Indeed, this issue was considered by the Court and dealt with in footnote 36, in which the Court stated: "To the extent that she is now arguing that she was denied an accommodation in connection with her license to teach ESL to adults, she has never indicated what accommodation she was seeking when she made such a request, nor is there any evidence that she informed the Union of such a request and was therefore ignored by the Union." (Mem. & Order at 40 n.36). Thus, under these circumstances, the Board's statement that "they would consider her request once she had been hired to a new position" referred to her request in connection with that teaching position and was, as the Court found, a "reasonable" response, particularly in light of the fact that she had never requested an accommodation in connection with any of her other teaching positions. Presumably, if she had had issues with classroom assignments or access to the building, those accommodation requests would have been specific to her assignment to teach as a per session teacher.

19

Plaintiff argues, without citing to the record, that the Union "told the Court that plaintiff had provided no evidence that the UFT failed to assist plaintiff with respect to her request for an accommodation." (Mot., Appx. A at j). However, the Union stated in its Rule 56.1 Statement that "Plaintiff did not seek the UFT's assistance in challenging the Board's September 14, 1998 decision" (Def.'s 56.1 Stmnt ¶ 14), and nowhere in any of her papers does plaintiff dispute this assertion. There is no evidence that upon receipt of the September 14, 1998 letter, she reached out to the Union for help. Indeed, when plaintiff brought a claim against the Union before the PERB, the Union informed the PERB that plaintiff had not sought the Union's help in challenging the medical bureau's decision (see Def.'s 56.1 Stmnt ¶ 17), which the Union concluded was evidence "that she has chosen not to contest the Board's September 14, 1998 letter, and she cannot lay any wrongdoing at the door of the UFT." (Pl.'s 56.1 Stmnt, Ex. 24 at 2). Nothing in plaintiff's argument suggests that the Court erred in this analysis.

### 8) Alleged Error No. 9

Plaintiff asserts that the Court erred when it found that "there is no evidence that the UFT engaged in tacit acceptance of disability discrimination through the collective bargaining agreement." (Mot., Appx. A at j). Plaintiff notes that the Committee established by the Union to help enforce disability regulations "had no power to enforce the contractual bargaining agreement," and "was merely there to advise members." (Id.) Plaintiff also notes that "the UFT admitted that the CBA had a clause prohibiting the employer from discriminating based on disability." (Id. at k).

None of plaintiff's cited facts give rise to an inference that the UFT tacitly accepted

20

disability discrimination. Indeed, the fact that the Union included a clause in the CBA prohibiting disability discrimination gives rise to an inference that the Union actually sought to prevent disability discrimination. Moreover, the fact that the Committee established by the Union "merely . . . advised members" instead of representing them does not suggest that the UFT tacitly accepted disability discrimination. Such representation may have reasonably been undertaken by other groups inside the Union that were tasked with representing members.

The two pieces of evidence cited by plaintiff buttress the Court's finding in its grant of summary judgment. Accordingly, plaintiff has not shown that the Court erred in this instance.

Plaintiff also contends that the Court erred when it wrote that "Mr. Fesko testified that 'the union established a committee to help enforce the regulations that existed with respect to teachers or members with disabilities.'" (Mot., Appx. A at j). Plaintiff's "Correction" states that "the committee . . . had no power to enforce the contractual bargaining agreement," noting that it "did not represent members but only assisted them." (Id.)

The Court first notes that it accurately quoted Mr. Fesko's deposition, so plaintiff's belief that the Court's statement was in error is without merit. Second, the Court notes that Mr. Fesko's statement is not inconsistent with the fact that while the Committee may not have formally represented members in lawsuits or other administrative proceedings, there are multiple ways in which the Committee could "help enforce regulations" affecting Union members with disabilities. For example, the Committee could undertake education programs designed to ensure that members of the Union were aware of their rights under the CBA and federal law. Apart from failing to show error, plaintiff also fails to explain how, even if the Court had erred in this statement, such error prejudiced her in any way.

21

9) Alleged Error No. 10

In the Memorandum and Order, the Court noted that the UFT "disputes a number of plaintiff's factual assertions." Specifically, the Union "does not admit that the 'R' notation was placed on her license in 1996 because she requested an accommodation." (Mot., Appx. A at k). Plaintiff contends that these statements in the Court's opinion were in error. In fact, a review of the Union's responses to plaintiff's requests to admit demonstrates that the Union disputed many of plaintiff's claims with respect to the "R" notation.[17] Even if there was some error in the Court's summary of these denials, plaintiff has failed to explain what, if any, impact that may have had on the Court's decision. Certainly, the characterization of "Error No. 8" as a "gross error" is inaccurate in that it implies that the error had any bearing on the Court's finding that the Union acted promptly to investigate the plaintiff's complaint with respect to the "R" notation and that by the time plaintiff sought the Union's help, the notation had been removed anyway. Thus, there was no basis for finding liability on the part of the Union. Even if the Union had admitted that the "R" notation was placed on plaintiff's license due to her request for an accommodation and that it represented a medical bar, the result would have been the same; the Union's actions

---

[17]Specifically, defendant denied plaintiff's request to admit that "the UFT knew, as early as May 18, 1998, that medical notations had been placed on all of plaintiff's licensing screens for appointment after she asked for a reasonable accommodation in 1996." (Pl.'s Req. To Admit 17; Def.'s Resp. 17). Defendant also denied plaintiff's request to admit that "the UFT knew, as early as May 18, 1998, that the employer's medical department failed to remove a medical notation of "R" from plaintiff's ESL licensing screen for appointment to teach in the Secondary Schools until May 1, 1998, after her medical and physical exam had been rated satisfactory on December 19, 1996." Defendant did, however, admit that the "R" notation was removed on or about May 1, 1998. (Pl.'s Req. to Admit 18; Def.'s Resp. 18). Defendant further denied that it "knew that plaintiff's ESL license for appointment to teach in the Secondary Schools was renewed on May 2, 1998, a day after an "R" was removed from plaintiff's licensing screen for that particular license." (Pl.'s Req. to Admit 19; Def.'s Resp. 19).

and conduct once alerted to the problem do not support a finding of discrimination or failure to comply with the duty of fair representation.

10) Alleged Error No. 11

Plaintiff asserts that the Court erred in its description of the letter from UFT representative Peter Mayglothling in which he "explained that in the Fall of 1996 an 'R' notation had been placed on Ms. Ayazi's file." (Mot., Appx. A at l). Plaintiff contends that the Court committed "GROSS ERROR," in that she claims that Mr. Mayglothling informed plaintiff in the letter that, "inadvertently, the 'R' on your ESL license was not removed until May 1, 1998 . . . ." (Id.)

This "Error" is not an error at all. The letter in relevant part reads as follows:

> I called Ms. Watson of the Medical Division on May 18, 1998. She informed me that in the Fall of 1996, you submitted a request for a medical accommodation to the Medical Division. When you made this request, you were employed as an appointed teacher of ESL at Grover Cleveland High School. She told me that the "R" simply means that the request you made was "under review."

(Def.'s 56.1 Stmnt, Ex. 2G at 2). The Court drew the reasonable inference that the "R" notation was placed on plaintiff's license when she applied for a medical accommodation. Even if this inference was not warranted, plaintiff does not explain the significance of such an error, and the Court can discern no way in which this purported "Error" would have affected the ultimate outcome of defendant's summary judgment motion.

23

11) Alleged Error No. 12

According to plaintiff, the Court erred when it stated that "Ms. Ayazi has not produced any evidence to contradict Mr. Mayglothling's letter," which stated that the "R" notation did not represent a block on plaintiff's employment and that he could find no basis for plaintiff's claims that her request for an accommodation and the "R" notation had resulted in the cancellation of her licenses. (Mot., Appx. A at l-m.) Even if plaintiff has since developed evidence which she believes supports her view that the "R" notation inhibited her ability to work and caused her license to be canceled, the key question before the Court was whether Ms. Ayazi presented such evidence to the Union at the time she requested the Union's help or that, *at the time Mr. Mayglothling wrote the letter,* the Union was in possession of information that contradicted his statements. Plaintiff has not presented any such evidence, and, therefore, there is no basis to conclude that the Court's statement was in error.

12) Alleged Error No. 13

The Court concluded that "[t]he undisputed facts demonstrate that the UFT considered plaintiff's complaints; they investigated her concerns . . . ." (Mem. & Order at 46). Plaintiff argues that the UFT did not investigate, and, therefore, the Court erred.

Peter Mayglothling, an employee of the UFT, indicated in his letter that he conducted an investigation and reported his findings to plaintiff in a letter dated May 26, 1998, concluding that the "R" notation had no effect on plaintiff's licenses. Plaintiff may disagree with the findings of his investigation, and may argue that the investigation was insufficient, but plaintiff has not cited any evidence to suggest either that Mr. Mayglothling did not actually make an inquiry into her

24

claim or that the Court erred by stating that "the UFT considered plaintiff's complaints" and that it "investigated her concerns."

### 13) Alleged Error No. 14

Plaintiff asserts that the Court erred when it held that "the UFT has not violated [42 U.S.C. § 12112(d)(3)-(4)] because it never required plaintiff to undergo a medical examination." In her alleged error, she claims that the ADA prohibits employers from requiring a medical entrance examination and that "[p]lacing 'R' notations on members' license screens to demote them . . . if the employer feels that they might have a medical problem now or in the future is a violation of the ADA." (Mot., Appx. A at n).

However, both of these claims relate to conduct by the Board, and plaintiff has adduced no evidence that the Union ever required a medical examination, or that the Union was responsible for placing the "R" notation in her file. Instead, it appears that plaintiff is challenging the Board's use of pre-employment medical examinations. Accordingly, this "Error" has no relevance to plaintiff's case against the UFT and is more properly addressed in plaintiff's action against the Board of Education.

### 14) Alleged Error No. 15

Plaintiff asserts that the Court erred when it stated that "[t]he crux of [Plaintiff's] argument seems to be that after her probationary status was terminated, she had the right to be rehired with an accommodation and that the UFT failed to pursue this claim for rehiring . . . ." (Mot., Appx. A at o).

25

Plaintiff recapitulates the substance of her case, but fails to cite any evidence submitted in this case to buttress her claim that the Court erred. Plaintiff cites the deposition of Steven Catalano, an employee of the Board of Education, but it appears that Catalano's deposition was not submitted by either party in this case.[18] Accordingly, the Court did not consider the deposition when deciding the motion for summary judgment and it would be improper to consider his testimony in this case given that the Union was never afforded an opportunity to examine Mr. Catalano.

### 15) Alleged Error No. 16

With respect to purported Error No. 16, plaintiff argues that "[t]he Court believes there is no evidence that the 'R' notation affects licenses." (Mot., Appx. A at q). In support of her contention that the Court is incorrect in its belief, plaintiff provides a document purportedly obtained from the Board with "a list of codes used by BOE to verify medical compliance." (Id.) Included in a list of "Medical Result Codes" is "R," which apparently means "Doctor Reviewing Medical." (Mot., Ex. 1). Under the heading "Verification of Satisfactory Medical for Fall of 1996," the document states that "[i]f a result other than 'S' ["Satisfactory"] or 'A' ["Assumed Medical"] appears . . . a medical is required before commencing service on any pedagogical payroll." (Id.) Plaintiff contends that this information confirms that the "R" notation "is not a good thing." (Mot., Appx. A at r).

As the Court noted in granting the motion for summary judgment, however, "regardless

---

[18]Catalano was deposed in connection with a different suit brought against the Board of Education, in which the UFT was not named as a defendant. See Ayazi v. Board of Education, Nos. 98-cv-7461, 08-cv-2456.

of whether plaintiff can prove her claim against the Board with respect to the 'R' notation, the question presented . . . is whether there are material facts in dispute as to whether the UFT, by failing to pursue a grievance on her behalf because of the 'R' notation, violated the Union's duty of fair representation." (Mem. & Order at 45). Whether the "R" notation had any effect on plaintiff's license–and the evidence presented to the contrary is significant–is immaterial. "By the time the Union learned of the 'R' notation . . . the notation had already been removed. Thus, there was no other action that the Union could have taken . . . and the only basis for challenging the Union's actions is plaintiff's claim that the Union failed to pursue a salary grievance on her behalf . . . ." (Id. at 46). The Court determined that the Union did not violate the duty of fair representation in this regard, and the evidence presented by plaintiff does nothing to affect the Court's analysis of the Union's actions.

## CONCLUSION

After reviewing plaintiff's motion and the Appendix of purported errors, the Court finds that plaintiff has failed to satisfy her burden under Local Civil Rule 6.3. Accordingly, plaintiff's Motion for Reconsideration is denied. Defendant is Ordered to serve a copy of this decision on plaintiff via first-class mail. The Clerk of Court is directed to close the case.

**SO ORDERED.**

Dated: Brooklyn, New York
October 7, 2011

/s/
Cheryl L. Pollak
United States Magistrate Judge

27